### SPARHAWK v. YERKES.

### SPARHAWK v. ACKLEY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 56, 57.  Argued October 28, 1891. — Decided December 7, 1891.

In December, 1871, Y., who was a member of the stock exchanges in New
York and in Philadelphia, was declared to be a bankrupt.  At that time
his seat in the New York Exchange was worth about $4000, and the other
about $2000.  By the rules of each, membership, in case of failure, was
suspended until settlement with its members who were creditors, and
the seat in each was liable to be sold and the proceeds applied to the
payment of the debts of such of its members.  At the time of his failure
the indebtedness of Y. to members of the New York Exchange amounted
to about $8500, and to members of the Philadelphia Exchange to nearly
$22,000.  The assignees notified each exchange of their appointment, but
took no steps to adjust the debts or to acquire the seats, which were
appraised as of no value.  Within two years Y. notified them that assess-
ments on the seats were overdue.  They told him he was the proper
party to pay them, and that what he might pay would be recognized as
properly to be refunded, in case the seats should be sold by them.  Y.
was discharged in bankruptcy in 1873.  From his private means he paid
all assessments overdue and from time to time maturing, and eventually
settled with all the creditor members.  Such members had proved their

1

debts against his estate in bankruptcy, and in the several settlements he had the benefit of the dividends (28 per cent) paid by the assignees. Having thus settled all such debts he was, in June, 1883, reinstated in his membership in the Philadelphia board, and in December, 1883, in his membership in the New York board. At that time the value of the Philadelphia seat was about $6000, and of the New York seat about $20,000. In November, 1885, the assignees filed bills against Y. and each board, to have these memberships decreed to be assets of the bankrupt's estate. *Held,*

(1) That the assignees must be deemed to have elected not to accept these rights as property of the estate;

(2) That Y. was not their trustee in expending his own money to give value to a property which was worthless and abandoned;

(3) That the assignees could not be permitted to avail themselves of the result of his action, or to take the property to work out a return of the dividends paid to these particular creditors.

THE court stated the case as follows:

Charles T. Yerkes, Jr., made a voluntary assignment for the benefit of creditors to Joseph M. Pile, October 21, 1871. On December 13, 1871, he was adjudicated a bankrupt in the District Court of the United States for the Eastern District of Pennsylvania, on a creditors' petition, filed November 10, 1871, and appellants were appointed his assignees, January 12, and the assignment of the bankrupt estate was duly made to them, January 24, 1872. In February, 1872, the bankruptcy court directed a transfer by Pile of the estate unadministered by him to the bankrupt's assignees, and this was subsequently executed and delivered.

Ninety-nine creditors proved debts in the aggregate sum of $829,198.45, upon which dividends were declared and paid as follows: July 19, 1872, ten per cent; May 12, 1873, nine per cent; April 5, 1878, eight per cent; and January 30, 1880, one per cent.

At the time of the adjudication Yerkes was a member of the New York and Philadelphia Stock Exchanges, which, it is conceded, were unincorporated associations. These memberships were included in the schedules filed in the bankruptcy proceedings, and therein stated to be " of no specific value," and in the inventory and appraisment of the estate subsequently made they were appraised as of no value. The

Philadelphia membership was then worth not over $2000 and the New York membership about $4000, but the bankrupt was indebted to members of the Philadelphia Stock Exchange in the sum of $21,842.11, and to members of the New York Stock Exchange in the sum of $8522.99, and under the rules of both associations membership was suspended until settlement with creditors, and, unless settlements were made as provided, the seats were to be sold and the proceeds divided among the creditor members. The assignees sent to the associations notice of their appointment, in January, 1872, and an additional notice to the New York Exchange, in May, 1873, stating that it was their duty to realize the value of the seat, and asking the president to indicate what form, if any, was prescribed by the rules for transfer or sale. They also addressed a communication to the Philadelphia board, and perhaps to both, in November, 1883.

At some time within two years after the assignment, Yerkes brought to the assignees a notice of an assessment or charge due to one of the associations on account of the membership, and asked them what they were going to do about its payment; they answered that as the claim had been made upon him, they thought he was the proper party to pay it, and that anything he paid would be recognized as properly to be refunded out of anything the assignees might realize for the seats.

On October 3, 1873, the bankrupt was discharged. In 1876 *Hyde* v. *Woods*, 94 U. S. 523, was decided, sustaining the validity of rules of stock exchanges providing for the application of the proceeds of sales of memberships to the debts due by members, which the assignees in these cases had previously been advised by counsel was the law. As testified by one of the assignees, they had not the slighest expectation of paying dividends aggregating over thirty-five per cent, and did not suppose that they could realize anything from the Philadelphia seat, because the indebtedness of the bankrupt to its members was largely in excess of its value, and of any dividend they expected his estate would pay (which was also true of the New York seat); they supposed *Hyde* v. *Woods* ruled the New York as well as the Philadelphia case, and

were instructed by counsel that the seats could not be made available so long as they were encumbered with an indebtedness to members of the guilds to which Mr. Yerkes belonged; and they did not propose to take any steps until they learned, in the fall of 1883, of Judge McKennan's decision, announced the 28th of the preceding March, in *In re Werder*, 15 Fed. Rep. 789.

Yerkes testified to several conversations, in which it was generally conceded by the assignees that they had no rights in the memberships, and that he had no idea that they ever expected to make such claim; while one of the assignees said that after the decision in *Hyde* v. *Woods* there was a conversation between Yerkes and them, in which it was admitted, that, for the time being, their proceedings were suspended as to further action, but that they never withdrew the claim.

From 1871 to 1876 the assignees took no steps to compel a conveyance or sale of the seats, and assumed no liability or responsibility for the assessments and charges, nor did they for eight years thereafter. In the meantime, Yerkes by personal solicitation persuaded the members of the associations to withhold for his personal benefit any demand for a sale. He paid from year to year the periodical assessments, and also either in money out of his own earnings or in services, the debts due the members, which debts had been reduced by the dividends paid by the estate. On June 18, 1883, the bankrupt was reëlected to membership in the Philadelphia Exchange, and on December 27, 1883, to membership in the New York Exchange, having made his settlements some time before. The value of the seats in both exchanges increased considerably in the lapse of time. In the New York board the value increased to some $20,000 in 1883, and in the Philadelphia board to about $6000 in the same year. Subsequently the New York seats rose in value to between thirty and thirty-four thousand dollars and the Philadelphia seats to between five and eight thousand dollars. As has been stated, by the rules of the exchanges, insolvency of a member or a failure to fulfil his contracts (bankruptcy being also specifically named in the Philadelphia rules), in effect worked suspension of mem-

bership, and there was a provision for the sale of seats after one year, on failure of the suspended member to settle with his creditors. In the rules of the New York board there was a provision for an extension of the time for settlement. Under both sets of rules a suspended member might be reinstated if the governing committee reported favorably upon his application. On April 28, 1884, the assignees presented a petition in the bankruptcy court for the sale of the memberships, which was dismissed, and on November 14, 1885, filed two bills in equity to accomplish the same purpose against the bankrupt and members of the New York and Philadelphia boards. The bills prayed that it might be decreed that the memberships were assets of the bankrupt's estate and vested in the complainants as his assignees; that they be sold and complainants' vendees admitted to membership in place of Yerkes; that if the court should determine that Yerkes was entitled to be reimbursed for any moneys paid by him for or on account of the memberships, such reimbursement should be decreed out of the proceeds of the sale, or if it should be determined that Yerkes was entitled to retain the memberships, he be ordered to account for the market value of the same and to pay complainants such amounts as they had paid as dividends upon the debts owed by Yerkes to his fellow-members of the association at the time of his insolvency and bankruptcy.

The cases were brought to issue, evidence taken, and a master's report made, to which exceptions were filed and hearing had thereon. The master (Mason) held that, by virtue of the assignment in bankruptcy, the assignees' rights in this peculiar property in these memberships were to settle and arrange the bankrupt's affairs to the satisfaction of his creditors, members of the associations, and having made satisfactory proof of settlement, to apply for readmission, which could be obtained with the consent of two-thirds of the governing committee in New York and of at least fourteen out of eighteen in Philadelphia, or, if they failed to effect a settlement in one year, then to have the memberships sold and the proceeds paid *pro rata* to the bankrupt's creditors in the exchanges; that the assignees exercised neither of these rights, and the member-

ships to which, ten years after his discharge, the bankrupt was again admitted constituted in effect after-acquired property; that there was no assumption of original rights *de jure;* and that the lapse of time was fatal to the assignees' claim, particularly in view of the section of the bankrupt law as to the limitation of actions.

The exceptions to the master's report were overruled, and the Circuit Court dismissed the bills upon the ground of laches. From these decrees appeals were prosecuted to this court.

*Mr. Wayne McVeagh* for appellants.

I. Yerkes, in dealing with his fellow-members of the stock exchanges, and in procuring his personal reinstatement to the seats from which he had been suspended, acted in effect as agent or trustee for the assignees and the body of his creditors, and his acquisition of the seats enured to their benefit.

Section 5046 of the Revised Statutes amounts to a plain statutory declaration that the title to these seats, subject to the claims of the members of the boards, vested in the assignees. "Assignees' duties relate chiefly to unsecured creditors." Mr. Chief Justice Waite, in *McHenry* v. *La Société Française d'Epargnes,* 95 U. S. 58. "The leading purpose of the bankrupt law is to secure an equal distribution of the bankrupt's property among his creditors." Mr. Justice Davis in *Avery* v. *Hackley,* 20 Wall. 407, 413. Speedy distribution is second in importance to equality of distribution. Mr. Justice Miller in *Baily* v. *Glover,* 21 Wall. 342. "Equal distribution of the property of the bankrupt *pro rata* is the main purpose which the Bankrupt Act seeks to accomplish." Mr. Justice Clifford, in *Buchanan* v. *Smith,* 16 Wall. 277, 301; *Wager* v. *Hall,* 16 Wall. 584, 601; *Merchants' Nat. Bank* v. *Cook,* 95 U. S. 342. "And fraud upon the equality of right among creditors of the bankrupt is committed when proof of debt is made by a secured creditor without mentioning lien." Bennett, J., in *Starks* v. *Curd,* 88 Kentucky, 164.

That a stock exchange seat is property or estate within the statute, and that it passes to assignees in bankruptcy, has been

already decided by this court. *Hyde* v. *Woods*, 94 U. S. 523. See also *In re Warder*, 10 Fed. Rep. 275 ; *In re Werder*, 15 Fed. Rep. 789 ; *Powell* v. *Waldron*, 89 N. Y. 328 ; *Grocers' Bank* v. *Murphy*, 60 How. Pr. 426 ; *Clute* v. *Loveland*, 68 California, 254 ; *Häbenicht* v. *Lissak*, 78 California, 351.

So far as the payment of money was a redemption, the fact was that the assignees furnished more money to redeem the New York seat ; the only money paid by Yerkes to New York Stock Exchange creditors being, as he states, $643.59, while the assignees paid in dividends to them $2263.29. It is submitted that the claim is no more meritorious as against the assignees who had not disclaimed title, than would be the claim of any third person who might have paid off the debts due the members of the stock exchanges, and then, had the rules of the exchanges permitted, procured his admission to the suspended memberships without a formal sale and purchase of the seats.

Suit by a bankrupt (or even possession by him) is protected only until intervention and claim by the assignee. *Cohen* v. *Mitchell*, 25 Q. B. D. 262 ; *Thatcher* v. *Rockwell*, 105 U. S. 467 ; *Hill* v. *Harding*, 131 U. S. App. cc. Indeed, the title of a stranger voluntarily redeeming such seats would be better than Yerkes's, for the former would be free from the objection fatal to Yerkes's claims that his trust relation to the estate forbade him from reaping an advantage at the expense of his creditors.

The provisions of the Bankrupt Act of 1867 all show the bankrupt to be charged with the duty of disclosure and delivery of his property to the assignees. See sections 5110, 5083 ; and *Means* v. *Dowd*, 128 U. S. 273 ; *Peters* v. *Bain*, 133 U. S. 670. Sec. 5051 provides " that the debtor shall . . . at the request of the assignee and at the expense of the estate, make and execute any instrument, deeds and writings which may be proper to enable the assignee *to possess himself* fully of all the assets of the bankrupt." This provision is without any limitation of time.

A principle applies similar to that which forbids a technical trustee purchasing at his own sale, or those having confidential

relations in respect to property from reaping an advantage in dealing with it. The rule which discountenances such transactions rests on the moral obligation to refrain from placing one's self in relations which, ordinarily, excite a conflict between self interest and integrity. *Michaud* v. *Girod*, 4 How. 503; *Van Epps* v. *Van Epps*, 9 Paige, 237; *Ringo* v. *Binns*, 10 Pet. 269; *Bennett* v. *Austin*, 81 N. Y. 308; *Schrenkeisen* v. *Miller*, 9 Ben. 55; *Hampton* v. *Rouse*, 22 Wall. 263.

The action of the bankrupt in seeking to possess himself of the property in these seats assumed the existence of some right to them remaining in him after the assignment to the assignees. But it is very clear that he had no possible claim upon it or right to deal with it. A bankrupt debtor after assignment has only a right to the surplus, or rather a hope or expectation of such right after the debts are paid. *Ex parte Sheffield*, 10 Ch. D. 434; *Bartlett* v. *Teah*, 1 Fed. Rep. 768.

It is insisted, therefore, that with the plain letter of the statute vesting title in the assignees, with the duty devolving upon the bankrupt of permitting the assignees to realize for his creditors everything possible out of the estate assigned to them, and with no plain and unmistakable refusal by them to appropriate these specific properties, this bankrupt was not entitled either at law or in equity to redeem the seats in question and hold them and their emoluments against the assignees.

There was absolutely no evidence to warrant the assumption by the master reporting as register that the assignees took only a "suspended membership;" that is, that the memberships were suspended before the rights of the assignees attached thereto. The position is unsound because there is nothing in the nature of a stock exchange seat which justifies it. The fact that the privileges of the seat are suspended upon insolvency, does not abolish the property in it. It does not become annihilated; it does not go to the exchange or to the other members. The seat retains its identity, and upon the continuance of the insolvency is sold under the rules as a distinct thing, and the purchaser takes that particular property, and, when elected, exercises the privileges accompanying it.

The master assumed that its character was given to it by the incident of an election or reëlection or restoration to membership being necessary in order to give the possessor of the thing all the privileges attaching to it. Instead of this being the fact, its character is given to it by its position as property, and the rules of the organization as to election to membership are strictly subsidiary. If the master's position were correct that the reinstatement to membership must be made within the times prescribed by the rules, or be lost, there would be an annihilation of membership on failure of the owner to claim it. But that this is not the case is shown by the rule which provides for sale of the seat, and payment out of the proceeds (1) of the debts of members, and (2) to the owner.

The right to readmission to the privileges of a stock exchange seat is very analogous to the right of renewal of a lease. It is held that this right is an essential part of the property of an expiring lease, and an assignee for creditors cannot be deprived of it by the bankrupt, or the bankrupt's vendee, procuring a new lease in his own name after bankruptcy. *Jones* v. *Slauson*, 33 Fed. Rep. 632.

Even where there is no covenant to renew, but merely an expectancy of renewal based upon occupancy of the premises, and where actual renewal depends upon the favor of the lessor, the property in the new lease attaches to the old lease and belongs to the owner of the latter. *Phyfe* v. *Wardell*, 5 Paige, 268; *S. C.* 28 Am. Dec. 430; *Gibbes* v. *Jenkins*, 3 Sandf. Ch. 130; *Mitchell* v. *Reed*, 84 N. Y. 556.

The master's conception of a membership obtained by readmission as distinct from a suspended membership, is purely of an academic and metaphysical character. It finds no basis in the facts proven, or the law governing, as to the nature of a stock exchange seat. It was evidently suggested by way of argument to sustain the remaining and principal grounds upon which the cases were determined.

II. As to the assignees' abandonment of their title. It is well understood to be the law that assignees in bankruptcy are not bound to accept property of an onerous or unprofitable

character. *American File Company* v. *Garrett*, 110 U. S. 288, 295. The master and the court were too quick to assume, notwithstanding the evidence, that the present were proper cases for applying this law, and for holding that the assignees had, as matter of fact, abandoned this property, and had therefore no further claim upon it.

But it is settled law that merely leaving a pledge in the hands of a pledgee with no offer to redeem, but also with no demand by the creditor for payment, is not of itself abandonment, and is not even evidence sufficient to justify submitting the question of abandonment to a jury. *Reynolds* v. *Cridge*, 131 Penn. St. 189.

The acceptance and appropriation of the pledge or property by the assignees by the continuous payment of dividends upon the stock exchange debts proved, which were liens against the seats, and which payments went to the reduction of the incumbrances upon them, was of itself ample to indicate their claim of title. *Welsh* v. *Myers*, 4 Camp. 368; *Thomas* v. *Pemberton*, 7 Taunt. 206.

After twenty years a presumption of abandonment would arise of course; but until that time elapses no such presumption arises. *Union Canal Co.* v. *Woodside*, 11 Penn. St. 176; *Steevens* v. *Earles*, 25 Michigan, 40.

III. As to the assignees being guilty of laches in asserting their title.

It is not understood to be contended that this claim is barred by the provision in the Bankrupt Act for a two years' limitation of suits. Rev. Stat. 5057. Lest, however, this contention should be made, it is proper to dispose of it at this point.

The act declares that no suit, either at law or in equity, shall be maintainable in any court between an assignee in bankruptcy, and a person claiming an adverse interest, touching any property or rights of property transferable to or vested in such assignee, unless brought within two years from the time when the cause of action accrued for or against such assignee. This provision is a substantial reënactment of the 8th section of the Bankrupt Act of 1841. It has been

held, under these acts, that the limitation applies only to suits growing out of disputes in respect to property and rights of property of the bankrupt, which came to the hands of the assignee, and to which adverse claims existed while in the hands of the bankrupt, and before assignment. *In re Frederick J. Conant*, 5 Blatchford, 54; *Stevens* v. *Hauser*, 39 N. Y. 302; *Sedgwick* v. *Casey*, 4 Nat. Bank. Reg. 496.

"The interest adversely claimed, and which the statute protects, if not sued for within two years, is an interest in a claimant other than the bankrupt." *Clark* v. *Clark*, 17 How. 315, 321; *Phelps* v. *McDonald*, 99 U. S. 298, 306; *French* v. *Merrill*, 132 Mass. 525.

But even if Yerkes be deemed, for any purpose, a claimant to an adverse interest within the statute, that interest did not begin until his admission to the stock exchange in 1883. Under the act of 1841 it was held that the limitation does not run till the taking of adverse possession. *Banks* v. *Ogden*, 2 Wall. 57. And the same doctrine has been maintained in interpreting the act of 1867 and other acts of the kind. *Beson* v. *Shively*, 28 Kansas, 574; *Gray* v. *Jones*, 14 Fed. Rep. 83.

The assignees filed their petition in the bankruptcy court for sale of these interests early in 1884. Their petition being dismissed, they continued the claim by bill filed in the Circuit Court, November 19, 1885. The present suits, for purposes of the limitation of the statute, are to be deemed a continuance of the proceedings begun in the bankruptcy court. *Marshall* v. *Knox*, 16 Wall. 551; *Adams* v. *Collier*, 122 U. S. 382, 389.

There is, therefore, no bar. And even if advantage cannot be taken of the time of beginning the proceedings in the bankruptcy court, the bill filed in the New York Stock Exchange case was quite within the two years.

IV. The appellants are at least entitled to be subrogated to the rights of the stock exchange creditors as against those seats to the extent of the dividends received by these secured creditors from the bankrupt's estate.

The right of subrogation is not doubtful. "A lien creditor proving his claim as unsecured does not extinguish his lien, but waives it *for the assignee's benefit as subrogatee*." *Starks*

v. *Curd*, 88 Kentucky, 164; *Cook* v. *Farrington*, 104 Mass. 212, 213; *Hiscock* v. *Jaycox*, 12 Nat. Bank. Reg. 507, 512.

V. The bankrupt is not entitled to be reimbursed the moneys paid by him to his creditors of the stock exchange.

The dues and assessments actually paid by Yerkes, it is conceded, should be returned to him, for they were paid under an understanding with the assignee that he should be reimbursed for such outlays. But further than this he has no claim upon the assignees.

Mr. *Frank P. Prichard* for appellees. *Mr. John G. Johnson* was on the brief for Yerkes, appellee, and *Mr. J. Rodman Paul* and *Mr. George W. Biddle* were on it for the Philadelphia Stock Exchange and the New York Stock Exchange, appellees.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

In *Hyde* v. *Woods*, 94 U. S. 523, it was ruled that the ownership of a seat in a stock and exchange board is property, not absolute and unqualified, but limited and restricted by the rules of the association; that such rules in imposing the condition upon the disposition of memberships that the proceeds should be first applied to the benefit of creditor members are not open to objection on the ground of public policy, or because in violation of the bankrupt act; and that in the case of the bankruptcy of a member his right to a seat would pass to his assignees, and the balance of the proceeds upon sale could be recovered for the benefit of the estate. While the property is peculiar and in its nature a personal privilege, yet such value as it may possess, notwithstanding the restrictions to which it is subject, is susceptible of being realized by creditors. *Ager* v. *Murray*, 105 U. S. 126; *Stephens* v. *Cady*, 14 How. 528; *Powell* v. *Waldron*, 89 N. Y. 328; *Belton* v. *Hatch*, 109 N. Y. 593; *Habenicht* v. *Lissak*, 78 California, 351; *Weaver* v. *Fisher*, 110 Illinois, 146.

Under the rules of the exchanges in question, suspension of membership followed upon insolvency, and if the debts due

members were not settled, the seats were to be sold, and the proceeds, after the charges due the associations were deducted, were to be distributed *pro rata* among those creditors. Reinstatement in or readmission to membership was provided for upon a settlement in full by the suspended member, and the action of the governing board in his favor. By the assignment in bankruptcy, all the bankrupt's rights of action for property or estate and of redemption, together with his right and authority to sell, manage, dispose of and sue for the same, as they existed at the time the petition was filed, passed to the assignees. Rev. Stat. § 5046. They might, therefore, as the master pointed out, have settled and arranged the bankrupt's affairs with the creditor members, and applied for readmission and a transfer in such manner, with the assent of the exchanges, as would have enabled them to avail themselves of the seats. They could have properly required the bankrupt to assist them in taking the necessary steps as between him and them and the associations, and in case of necessity might have resorted to the courts.

They were not bound, however, to accept property of an onerous and unprofitable nature, which would burden instead of benefiting the estate, and they could elect whether they would accept or not, after due consideration and within a reasonable time, while, if their judgment was unwisely exercised, the bankruptcy court was open to the creditors to compel a different conclusion. *Glenny* v. *Langdon*, 98 U. S. 20; *American File Co.* v. *Garrett*, 110 U. S. 288.

At the time of the filing of the petition in bankruptcy, November 10, 1871, and of the bankrupt's discharge, October 3, 1873, these suspended memberships were confessedly of no value to the estate and were so appraised, because no possible dividend could be paid equal to the excess of the debts due members over the then value of the memberships.

It may be assumed that the assignees regarded the expenditure of money in the payment of annual dues and charges, and in settlement with creditor members, as not justifiable under the circumstances. At all events, for twelve years after their appointment, and ten years after the bankrupt's discharge,

they took no steps to obtain possession, and asked no assistance in that regard from either the bankrupt or the courts; made no payments to the associations and attempted no settlements with the creditor members; considered the realization of any-thing as substantially impracticable in view of the situation and of judicial decision; and contented themselves with the hope that masterly inactivity might enable them to assert a claim if by the efforts of the bankrupt the load of debt which weighed down the right to the seats was lifted, and in the progress of years the value of such seats happened to increase instead of diminish.

Nor did they seek a sale, nor to compel the creditor members to realize upon or agree to a valuation of the seats and prove only for the balance of their claims, under Rev. Stat. § 5075, if applicable, or otherwise to gain the benefit of such reduction as might thus be obtained, but, on the contrary, allowed these creditors to prove their debts in full, and paid dividends thereon, without objection.

Except that they notified the exchanges of their appointment, they did nothing in the way of taking possession or of the preservation of the property, and for several years prior to the reinstatement they communicated neither with the bankrupt nor the exchanges in regard to the matter. Their conduct can be viewed in no other light than that of an election not to accept these rights as property of the estate.

. The policy of the bankrupt law was, after taking from the bankrupt all his property not exempt by law, to discharge him from his debts and liabilities and enable him to take a fresh start. Henceforward his earnings were his own, and after his adjudication and the surrendering of his property to be administered, he was as much at liberty to purchase any of the property so surrendered as any other person. *Traer* v. *Clews,* 115 U. S. 528.

In order to reacquire his seats Yerkes paid the annual dues to the exchanges and the assessments for their gratuity or trust funds, a scheme of life insurance for the benefit of members, which added to the value of the memberships when payments were kept up, and which funds were established after

the bankruptcy. He induced his creditor fellow-members, out of personal consideration for him, and for his personal benefit, to withhold a demand for a sale under the rules, and finally paid them all in full. Those payments were made, in cash or personal services, out of his earnings subsequent to his bankruptcy, and, as appears from his sworn answer, as well as his testimony, under the belief that the assignees never expected to set up any claim to the seats.

The assignees admit in substance that they knew that Yerkes wished to retain his seats; that he was of opinion that they could do nothing with them; that he was preventing by his own exertions any sale by the board creditors; and that he was paying off their claims.

Thus, by the devotion of his own time and earnings, this worthless and abandoned property became valuable, and the assignees acquiesced in the transmutation, as it was accomplished, without action and without objection.

It is to be observed that Yerkes was in no sense the agent or trustee for the assignees or for the creditors, in thus expending his money and labor for the preservation of the seats. Whatever information he could impart, or assistance he could render, in facilitating the action of the assignees in the line of their duties, was to be expected of him, and up to the time of his discharge he could have been compelled by summary order to assist in perfecting possession in the assignees of property which had passed to them, and which they had accepted; but he was not bound to contribute his own time and money to the removal of burdens which they declined to assume, and whose existence put the rights to readmission out of the category of available assets, and justified the election of the assignees not to accept them.

We hold that the assignees, after sedulously avoiding for years any responsibility in the premises, the assumption of any relations to the exchanges, the taking of any steps to free the rights from encumbrance, or to realize upon them as encumbered, and allowing the bankrupt, by the use of after acquisitions, to create a value not theretofore possessed, cannot be allowed to come into a court of equity, and, in spite of

laches and acquiescence of the most pronounced character, invoke its aid to wrest from him the fruit of his independent and lawful exertions, and reap where they had not sown. Under such circumstances they do not come with clean hands.

Clearly the sale of the present memberships to a nominee of the assignees, and the admission of such nominee upon the ouster of Yerkes cannot now be coerced, and if Yerkes's title is not open to attack he cannot be decreed to account for the market value thereof to the extent, in whole or in part, of the dividends which the creditor members received. In order to obtain the seats their claims had to be settled in full, and such settlement was not waived by their being proved in the bankruptcy proceedings, without objection then or for thirteen years thereafter. The dividends were not paid in order to protect the rights of the assignees or to save the memberships, and while, by reason of the extinguishment of the debts *pro tanto*, Yerkes may be said to have paid less than he otherwise would, yet he paid much more than the value of the seats at the time of the bankruptcy, in addition to the amount of the dividends. The parties well understood that the dividends could not at best reach more than a certain percentage, and that the debts due the members of the association, after that percentage was deducted, far exceeded the value of the seats. The assignees deemed it unwise and impracticable to attempt to speculate upon a future rise in that value, and, declining to settle with the creditor members, to pay the periodical charges, and to enter into relations with the exchanges and those creditors, proceeded to close up the estate, without regard to these remote expectancies, apparently with commendable promptitude. As we have said, they cannot now be permitted to avail themselves of the results of what Yerkes did and they did not do, nor can they lay hold of his property to work out a return of what the estate paid to these particular creditors in common with the others.                    *Decrees affirmed.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE HARLAN, dissenting.

MR. JUSTICE HARLAN and myself dissent from the foregoing opinion and judgment.

By the assignment in 1871 the memberships in the two exchanges were transferred to the assignees. They were then worth $6000. By the rules of the exchanges, debts to members were a prior lien. Those debts then amounted to $30,-365.10. In other words, the assignees took title to property worth $6000, subject to a lien of $30,365.10. If then sold, the debts of the bankrupt would have been reduced by the amount of $6000. By making the sale the assignees would have assumed no special obligation for the balance of the debts having a lien upon these memberships. They should have sold at once, or waited to see if there was a rise in value. They chose the latter. They never, in terms, relinquished their claim upon the property. The *ad interim* payments made by the bankrupt only kept alive certain insurance, which on his death would have enured to the heirs, and not gone to the assignees. Such payments, therefore, were wholly for his benefit, and not for the assigned estate, or for the creditors.

The assignees have paid dividends aggregating 28 per cent, or to the creditors holding such liens $8502.22. The bankrupt, the assignor, availing himself of this payment, by services and money, pays off the balance of these lien claims and appropriates to himself the seats in the exchanges, now worth $35,000 to $42,000. The result is that the delay of the assignees, wise as it would seem from the increased value of the property, is adjudged an abandonment. Property then worth $6000 is not appropriated to the reduction of the debts against the estate; on the contrary, the bankrupt gets the benefit of $8500 paid out of the estate assigned for the benefit of creditors, uses that payment to reduce the claims against this property, and, paying off the balance, repossesses himself of the property, now worth over $35,000.

We see neither equity nor law in this conclusion, and therefore dissent.

MR. JUSTICE BRADLEY and MR. JUSTICE GRAY did not hear the argument, and took no part in the decision of these cases.