## MIDDLETON v. FIDELITY–PHILADELPHIA TRUST CO. et al.

Circuit Court of Appeals, Third Circuit.
November 7, 1929.

No. 4036.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (Howard H. Yocum and J. Rodman Paul, both of Philadelphia, Pa., of counsel), for appellant.

Percy Granger, Robert T. McCracken, Geo. J. Edwards, Jr., C. Russell Phillips, Breeding, Burkhardt & Harris, and Reber, Granger & Montgomery, all of Philadelphia, Pa., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and RELLSTAB, District Judge.

RELLSTAB, District Judge. On March 23, 1927, Frank C. McCown, Jr., individually and trading as McCown & Co., was adjudged a bankrupt upon an involuntary petition, filed on February 28, 1927. For a number of years prior to his insolvency, he was a stock broker and a member of the Philadelphia Stock Exchange.

More than four months before the filing of this petition, he, trading as aforesaid, deposited a number of his customers' securities with J. S. Bache & Co., stock brokers, as collateral security for the payment of a loan which it had made to him. A member of Bache & Co. was also a member of the Philadelphia Stock Exchange. In order to obtain payment of this loan subsequent to McCown's insolvency, Bache & Co. sold the pledged securities. After payment of all sums due it from McCown & Co., there remained a credit balance in cash in its hands of $11,879.35. It declined to pay this balance to the bankrupt's trustees.

Upon the petition of the trustees, the referee in bankruptcy granted against Bache & Co. a rule to show cause why this money should not be paid to them. In answering, Bache & Co. stated that it refused to pay this balance to the trustees for the reasons, in brief, that at the time of said loan transactions it and McCown & Co. were members of the Philadelphia Stock Exchange, and the exchange claimed the exclusive right to the balance; and that, "pending determination of the rights of the various claimants to the said fund," it "would be compelled to refuse payment of the said balance to said trustees." It

further pleaded that, in submitting itself to the referee's jurisdiction, it reserved the right to review the referee's rulings in the appropriate tribunals, and that "this admission" was expressly conditioned upon the exchange's being made a party to the proceedings to assert its claim to this balance.

Subsequently, on behalf of the members of the exchange, an unincorporated association, the president thereof filed his petition with the referee averring, inter alia, the willingness of the members to submit to the referee's jurisdiction on like reservation of reviewing the referee's rulings, and praying to be permitted to intervene, and for a decree holding that the money in question was legally applicable to the payment of the claims of the exchange members, creditors of McCown, prior to the payment of the claims of his other creditors.

The record does not show that this intervention was opposed or formally allowed, but the subsequent proceedings indicate that the exchange was admitted as a party.

This preferential claim of the exchange's is based on certain provisions of its constitution to which its members subscribed and bound themselves on their admission to membership. These provisions are article V, § 5; article X, §§ 4, 5, 6, 8 (subsec. 3), 9, 10, and 11; article XI, §§ 1 to 6 and 10. Most of these have little bearing upon the present controversy. Article V, § 5, provides for an arbitration committee to decide differences between members of the exchange, and between such members and nonmembers who agree to abide by the rules of the exchange, where the differences arise "from transactions in bonds, bullion, stocks or other securities, or from any transactions in money." Article X deals with the member's seat in the exchange called the membership. Section 4 provides that the proceeds of the sale of the membership "shall, after deducting all charges due to the Exchange, * * * belong to its owner's creditors in the Exchange, in proportion to the amount of their respective claims."

Section 5 relates to the disposition of the right of membership on the death of its owner, and section 6 charges the membership with the expenses incurred by the exchange in respect thereto.

Section 8 (subsec. 3) relates to suspension of the member.

Section 9 provides for sale of the seat or privilege on termination of membership.

Section 10 provides that "the liability of every membership, whether solvent or insolvent, to its owner's creditors in the Stock Exchange, shall include all indebtedness of its owner's firm and all indebtedness to a firm,

any member of which is also a member of the Exchange, contracted during the existence of the co-partnership."

Section 11 subjects the member to suspension in case he shall not dissolve his connection with an unsatisfactory partnership.

Article XI deals with insolvent members and those failing in their contracts.

"Sec. 1. Any member who fails to comply with his contracts, or who becomes insolvent," shall be suspended "from the privileges of the Exchange."

"Sec. 2. Members holding securities deposited by the insolvent, as margins on his contracts, are authorized, * * * to sell the same, and, after satisfying the claim of such creditor or creditors, to pay over the remainder, if any, as directed by the Governing Committee; * * * When a difference becomes due by a sale of collateral which had been held to secure a loan, the difference so created shall be treated as an unsettled contract."

"Sec. 3. On the failure of a member of the Exchange, all claims against him must be reported in writing to the Secretary within thirty days, and all claims held by him against other members shall be handed over to the Treasurer, and by him held for the benefit of the insolvent's creditors, and it shall be his duty to record the same in a book kept for that purpose, after the Arbitration Committee have examined and passed upon the claims presented against his membership."

Sections 4 and 5 relate to notes of insolvent members and the failure of members to comply with their contracts.

"Sec. 6. If any suspended member fails to settle with all his creditors within six months from the time of his suspension, his membership may be disposed of by the Committee on Admissions, and must be sold at the end of twelve months; and the proceeds, after deducting all charges due to the Exchange —to be determined in cases of controversy by the Arbitration Committee—shall belong and be paid to his creditors in the Exchange in accordance with section 3."

"Sec. 10. The proceeds arising from the sale of the membership of an insolvent shall be divided pro rata by the Arbitration Committee among the creditors recorded, as in Section 3, and if any balance remain, it shall be paid over to the insolvent."

It is admitted that the purchases and sales made by Bache & Co. for the account of the bankrupt were not made upon the Philadelphia Stock Exchange, but upon the New York Stock Exchange and the New York Curb; that Bache & Co. closed out its account with the bankrupt "in an attempted compliance"

with article XI, § 2, of the constitution of the Philadelphia Stock Exchange; and that the indebtedness of the bankrupt to members of the Philadelphia Stock Exchange aggregated more than the fund in question. The referee decided against the claims set up by the exchange, and made absolute the rule issued against Bache & Co.

Bache & Co. did not petition for a review of the referee's decision, and on the face of the record is bound thereby. On the petition of the exchange for review, the District Court affirmed the order made by the referee, and further decreed "that J. S. Bache & Company and/or the Philadelphia Stock Exchange in whose ever hands the said fund shall be found at the date of the entry of this decree * * * forthwith deliver and pay over to * * * (the) Trustees in Bankruptcy of Frank C. McCown, Jr., individually and trading as McCown & Co., the cash in their hands belonging to the Estate in Bankruptcy * * * amounting to the sum of $11,879.-43, together with any interest or income accrued. * * *"

At the outset it must be observed that no claim is made by any member of the exchange, other than Bache & Co.; that there existed a contract with McCown involving the pledged securities. It is conceded that under McCown's contract with Bache & Co. he could have repossessed himself of these securities by payment of the debt secured thereby, and it follows that, if he had not become insolvent, any balance remaining in Bache & Co.'s hands from the sale of the securities, after payment of his indebtedness to it, as between them would have belonged to him and would have been subject to his order. By the express provisions of section 70a of the Bankruptcy Act (11 USCA § 110(a) the trustees are vested with all the "powers which he (the bankrupt) might have exercised for his own benefit" (subdivision (3), of all "property which prior to the filing of the petition he (the bankrupt) could by any means have transferred" (subdivision (5), and of all "rights of action arising upon contracts or from the unlawful taking or detention of, or injury to, his property" (subdivision (6). On the intervention of bankruptcy, a sale of these securities having taken place and a balance found in Bache & Co.'s hands, the title to that balance, by operation of the Bankruptcy Law, passed to the bankrupt's trustees, and should have been turned over to them notwithstanding the demand of the exchange, even though Bache & Co. believed the claim of the exchange was well founded. Even the title to a seat of an insolvent member of a stock exchange passes to the trustee in bankruptcy, though the proceeds of a sale thereof must be first applied to the payment of certain of his creditors' claims. Hyde v. Woods, 94 U. S. 523, 24 L. Ed. 264; Sparhawk v. Yerkes, 142 U. S. 1, 5, 12 S. Ct. 104, 35 L. Ed. 915; Page v. Edmunds, 187 U. S. 596, 23 S. Ct. 200, 45 L. Ed. 318; Board of Trade of City of Chicago v. Johnson, Trustee, 264 U. S. 1, 44 S. Ct. 232, 68 L. Ed. 533. A fortiori where the fund has no relation to the member's seat, and arose out of transactions not carried on in the exchange, but elsewhere.

The decree appealed from might properly, and perhaps should, be affirmed on this ground alone, as the bankrupt's trustees are not only the proper persons but the only ones contemplated by the Bankruptcy Act to administer and distribute the property of the bankrupt. Section 2 (2), (6), (7), and (15), section 47a (2), section 64b, sections 67a, 67b, and section 70a (3), (5), and (6), 11 USCA § 11 (2), (6), (7), and (15), § 75 (a)(2), § 104 (b), § 107 (a) and (b), and § 110 (a) (3), (5), and (6).

However, we are requested by the appellant to determine on this record what it claims ultimately will have to be determined in this case, viz., whether the exchange has a legal right to provide by its rules that upon the insolvency of one of its members any indebtedness due him by its solvent members should be applied to the payment of the insolvent's indebtedness to his creditors who are members of the exchange before his other creditors may participate therein, and whether such rules are enforceable, even though the insolvent becomes an adjudicated bankrupt. Both the referee and the District Judge lent themselves to accomplish this purpose. We do so also, but hesitatingly and reluctantly, as we deem it doubtful practice, and with the express pronouncement that our so doing is not to be taken as a precedent warranting such a course.

Appellant in advancing such right mainly relies on article XI, sections 3 and 6. Section 3, as noted, deals directly with claims held by the failing members, which, by its terms, are to "be handed over to the Treasurer, and by him held for the benefit of the insolvent's creditors."

If the last two words are to be given their literal meaning, no priority is given to member creditors over those who are nonmembers. Appellant, contending otherwise, relies upon the concluding words of section 6, viz., "in accordance with section 3." But section 6 deals solely with the disposition of the proceeds obtained from a sale of the suspended member's seat or membership, and there is no more

warrant for holding that the provision for payment of such proceeds in accordance with section 3 is intended to restrict the meaning of the word "creditors" in section 3 to only such creditors as were members of the exchange than there would be for holding that the meaning of the words "creditors in the Exchange" found in article X, § 4, should be enlarged so as to include all the creditors of the member. The part of section 3 invoked is that which provides for the time within which claims against the failing members are to be presented, the barring of all claims not so presented, the action of the arbitration committee upon claims presented against the insolvent's membership, the reporting of the terms of any settlement made with a member unable to meet his contracts, and the subordination of such claims in certain stated circumstances. There is nothing in section 6 that warrants an interpretation of the quoted words of section 3 different from that as expressly written.

Taking into consideration all the rules of the exchange pleaded and proven, it is perfectly clear that they distinguish between the rights of member creditors in the proceeds realized from a sale of the insolvent's membership and their rights in the proceeds of the insolvent's claims "against other members." The proceeds in the former case "belong to its owner's creditors in the Exchange, in proportion to the amount of their respective claims" (article X, § 4); in the latter case they are to be held by the treasurer "for the benefit of the insolvent's creditors" (article XI, § 3).

Such a disposition of the proceeds derived from the sale of an insolvent's membership is in complete accord with the cases hereinbefore cited, and the preservation by the exchange of the insolvent's claims against member creditors for the benefit of his creditors generally is not out of harmony with the accepted purpose of the Bankruptcy Act and the particular provisions thereof heretofore set out.

The referee, while noting the limitations of the words "for the benefit of the insolvent's creditors" in regard to the insolvent's claim against members of the exchange, and its contention that they meant the creditors who were members of the exchange, and without determining that question, proceeded to deal with its further contention based on the alleged meaning. The District Judge also proceeded to a determination of such further contention, preceding it with the statement: "It may further be assumed that the word 'creditors,' in the rule last quoted [article XI, § 3] means only such creditors as were members of the Stock Exchange."

Before us the appellees do not raise the question of the proper meaning of this phrase. The referee considered the rules relied upon by the exchange as an attempt "to set up an extra-judicial tribunal, making certain creditors preferred who are not recognized as such by the general law."

In the District Court the learned judge in reviewing the referee's findings said: "Reduced to its elements, the question involved is whether McCown's pledge of securities with Bache & Co., in connection with his prior acceptance of the rules of the Stock Exchange, operated as an assignment to potential creditors in the exchange of his equity in such securities, and, if so, whether such assignment can stand against general creditors, in view of the provisions of the Bankruptcy Act avoiding preferential transfers; or, if any limitation arising out of the law relating to assignments should seem to stand in the way of a decision upon the ultimate question involved, the pledge may be just as easily treated as an agreement of trust by which Bache & Co. agreed to hold the equity in trust for such creditors in the Stock Exchange as McCown might have at the date of his insolvency. The essential point is the validity of the transaction as against the Bankruptcy Act." He held that as "the rights of the Stock Exchange creditors were wholly contingent upon the insolvency of the pledgor," and that McCown had the right at any time before his suspension, or possibly his insolvency, to redeem the collateral by paying the debt and thus "resume absolute control and dominion over the thing assigned," therefore under Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991, "the acquisition of indefeasible rights by the Stock Exchange creditors, occurring as it did only upon insolvency, is a voidable preference under the Bankruptcy Act." He concluded, by quoting from the referee's opinion, as practically summarizing what he had said, the following: " 'But, even if this could be regarded as an assignment, it was an assignment merely of what might be termed a contingent equity, to become effective only upon insolvency, when the Bankruptcy Law had begun to operate, and to fix the status of all classes of creditors.' "

The cases mainly relied upon in appellant's challenge of the decree appealed from are: Hyde v. Woods, 94 U. S. 523, 24 L. Ed. 264, supra; In re Gregory (C. C. A. 2) 174 F. 629, 27 L. R. A. (N. S.) 613, and Ex parte Grant, 13 Chan. Div. 667, not because they dealt with the precise question as here pro-

pounded by it, but because the reasoning employed therein necessarily includes and controls it. Of course, in dealing with these citations, we shall assume, but only for present purposes, that the term "creditors," used in article XI, § 3, means only such as are members of the exchange, and that the purpose of the exchange's rules "was to charge the trading accounts and the transactions of members with a lien in favor of fellow-members in the Exchange."

In Hyde v. Woods, 94 U. S. 523, 24 L. Ed. 264, supra, a rule of the stock exchange, which provided that the proceeds of the sale of a member's seat—the membership being limited in number—"shall, to the exclusion of his outside creditors, be first applied to the benefit of the members to whom he is indebted," was held valid; being neither "contrary to public policy, nor in violation of the Bankrupt Act." The reasons assigned were: That, while the seat was property, it was "incumbered with conditions when purchased, without which it could not be obtained." That the rules of the exchange "entered into and became an incident of the property when it was created, and remains a part of it into whose hands soever it may come. As the creators of this right—this property—took nothing from any man's creditors when they created it, no wrong was done to any creditor by the imposition of this condition." That the burden which accompanied this species of property "was imposed by those who had a right to do it, and to make it an accompaniment of any title which they gave to it."

In the instant case the property involved is of an entirely different character. Its value was not created by any action, or by the rules, of the exchange. It grew out of a contract between stockbrokers. It owes its existence to the value of the collateral pledged, which in no way was affected by the fact that the contracting parties were members of the exchange. The value would have been the same and the results no different even if neither of the contracting parties had membership in the exchange.

The facts in Re Gregory (C. C. A.) 174 F. 629, 630, 27 L. R. A. (N. S.) 613, supra, and Ex parte Grant, 13 Chan. Div. 667, supra, approach nearer those of the case at bar. The former involved claims of fellow members of the exchange against the proceeds resulting from the closing out of the bankrupt's floor transactions under the rules of the exchange as well as claims against the proceeds from the sale of his seat. Both were given priority in payment over those of his general creditors. The court thought the exercise of the license to do business as a member of the

exchange, viz., the purchase and sale of stocks from and to members of the exchange, resembled the ownership of the license, and it saw "no such difference between the seat and profits from stock transactions as to require a different disposition of the latter from the former." It held that the "reasoning of the Supreme Court in Hyde v. Woods, supra, and Page v. Edmunds, 187 U. S. 596, 23 S. Ct. 200, 47 L. Ed. 318, * * * applies equally to credits accruing from transactions of the bankrupt on the floor of the Exchange closed out under the rule."

The instant case differs from the Gregory Case in that the fund here arose out of transactions on an exchange other than that of the claimant, and that the account between Mc-Cown & Co. and Bache & Co. was not closed out on the floor of the Philadelphia stock exchange, but elsewhere, though "in an attempted compliance with Rule XI, sec. 2" of that exchange which, as noted, requires the payment over of any remainder "as directed by the Governing Committee."

In Ex parte Grant, 13 Chan. Div. 667, supra, the fund paid over to the officers of the exchange was created by the amounts due the bankrupt member by the debtor members on contracts for the sale and purchase of stocks which, under the rules, had to be closed out on the bankrupt's default to settle on the next account day.

In that case it should be noted also that the official assignee of the exchange had not submitted himself to the summary proceedings at the instance of the trustee in bankruptcy, while in the case now before us a plenary suit was expressly waived. Judge James, who participated in the opinion in the Grant Case, thought the lack of jurisdiction over the official assignee a significant circumstance, saying in that behalf that the assignee "claimed it hostilely to the trustee, and how, then, can the trustee receive it from him as money paid to his use? * * * The official assignee claims these differences in his own right, and of course the payment which was made to him would not discharge the debtor if the debtor had paid it to the wrong man; he would still remain liable to pay it to the other. * * * Any one of the outside world—e. g., the trustee in the bankruptcy—retains all his rights against any debtor to the bankrupt, although he be a member of the Stock Exchange, just in the same way as he would if those rules which provide for payment to the Stock Exchange assignee had never existed." The noted differences between the facts underlying the decree in the instant case and those shown in the Gregory and Grant Cases, in our judg-

ment, are substantial and call for the application of a different rule of law.

But appellant contends that the rationale of the Hyde v. Woods decision, and which was held to control the decision in the Gregory Case, is equally applicable here, and that "there can be no distinctions in principle, so far as the Bankruptcy Act is concerned, between balances incident to transactions on the floor of the Exchanges, closed out under the Constitution and Rules of the Exchange, and balances incident to any other transactions on the Philadelphia Stock Exchange between members of the Exchange." The latter part of this proposition does not correctly state the case before us, as the transactions underlying the present controversy, as before stated, did not take place on the Philadelphia Exchange. Passing this discrepancy in stating the premises underlying appellant's contention, we are of the opinion that there is an essential difference, first, "between the seat and profits from stock transactions" and, second, between "balances incident to transactions on the floor of the Exchange" and those arising from transactions carried on elsewhere.

*As to the seat on a stock exchange:* The money value of this, as noted, is due entirely to the exclusive control by the exchange over its creation and continuance. So conditioned, it is a species of property radically different from a fund arising solely from the sale of property, to the creation and possession of which the exchange in no way ·has contributed. To say that the latter species of property is impressed with a like limitation as the former, to our minds, is non sequitur.

Property in a member's seat is held primarily liable for the debts of member creditors, not because of a conceded right of an exchange to subject any property held by a failing member to the claim of fellow members, but because of the peculiar character of that kind of property, as heretofore described, and because it is not contrary to any positive law or accepted public policy. Its exemption from being subjected to claims of general creditors stands on facts peculiar to that kind of property. These peculiarities are not found in brokers' ·trading accounts.

The reasoning in Cohen v. Budd, 52 Misc. Rep. 217, 103 N. Y. S. 45, 46, affirmed without opinion, 117 App. Div. 922, 102 N. Y. S. 1133, was deemed by the referee as supporting his conclusions, and the appellees cite it as "irrefutable."

In that case the court said: "The defendant claims that the principle of the case cited [Hyde v. Woods, 94 U. S. 523, 24 L. Ed.

264] would sanction a rule providing that claims due from members to a defaulting member may be collected by the exchange and applied to debts due other members, upon the theory that the rights of general creditors must be deemed subordinate to the restrictions imposed upon a member as a condition of acquiring membership. I do not think the contention is sound. Such a rule would practically take the estate of an exchange member out of the bankruptcy law. Even if such a rule were enforceable its application could in no event be extended to transactions arising upon other exchanges. Concededly, a portion of the fund in dispute resulted from transactions upon other exchanges, and to that extent, at least, the rule is clearly opposed to public policy. Stock exchanges have the power to enact such rules and regulations concerning the government of their affairs as may be necessary to carry out their purposes but such rules and regulations must not be contrary to the law of the land." While this reasoning was unnecessary to the decision of that case, inasmuch as the rule of the exchange was adopted after the broker became a bankrupt, as a dictum we deem it both sound and persuasive.

*As to the balances arising from transactions between members of the exchange:* The exchange may properly take cognizance of transactions occurring on its floor, and as a necessary incident may not only regulate the transaction, but exercise reasonable coercive control over the participants therein in respect thereto. As an incident to this control a member may be disciplined by the exchange for improper conduct occurring anywhere, to the extent of suspension, or even expulsion, and deprive him of his seat or membership. But neither this regulatory nor this coercive power can be validly exercised so as to embrace contracts entered into between members and actually carried out on other exchanges or places elsewhere than the particular exchange of which they are members, so as to exclude the grip and operation of the bankruptcy law.

Based on the erroneous supposition that there is a complete analogy between these two kinds of transactions, the further contention, viz., that because of the rules of the exchange trading accounts between members of the exchange are "charged with a lien from the moment of their inception * * * in favor of his creditors in the exchange," is also untenable. Whatever merit there may be in this argument, it must be confined to those transactions occurring on the floor of the exchange. For the reasons just given, it can-

not validly dispose of property dealt in outside of the exchange. A stock exchange, no more than any other trade or business association, by its rules may not classify creditors or impound assets for the sole benefit of a particular class. Classifications of that character will only be recognized when made by the law of the land.

Thus far, in dealing with this controversy, we have not alluded to appellees' insistence that the securities pledged by McCown to Bache & Co. were not his, but his customers', and that he was without authority to pledge them. The only reference to this lack of authority contained in the record, is found at the close of a letter dated January 26, 1928, sent by the trustees in bankruptcy to one of their counsel, wherein they listed the securities pledged by the bankrupt with Bache & Co. This reference is as follows: "No authority was received by McCown & Company from any of the customers, whose securities these were, to pledge them in a general loan."

This letter appears of record after the close of the testimony as one of the "offers in evidence." The basis of this letter as evidence seems to be the statement of one of the counsel for the trustees, made during the examination of McCown's cashier. It was in response to the following question asked by appellant's counsel: "You submitted to the Referee a list of the securities in the possession of McCown & Co. at the date of their failure, I believe?" when the trustee's counsel interjected and said, "I have such a list and will forward it to the Referee promptly."

As a list of securities this letter seemingly is evidence, but is it so as to the assertion of lack of authority?

Appellees have so treated it in their brief and argument, and appellant has not gainsaid it. Had it been challenged in the present state of the record, we would have had to ignore it.

To our minds, however, as far as the present decision is concerned, it is not material whether McCown had or had not such authority. If he had not, that would be but an additional reason why the fund should be paid over to the trustees, who in case of bankruptcy represent all creditors. In the administration of bankruptcy estates all claimants to funds or other property taken over by the trustee can have their claims adjudicated in the bankruptcy court. No creditor or claimant should be forced to bring suit against an adverse claimant, who, by reason of the debtor's disregard of the bankruptcy law, obtains possession of the disputed fund. If such a suit must be brought, it should be by the trustee.

Assuming for present purposes the correctness of appellant's contention that the rules of the exchange require the moneys due by its members to a failing member thereof shall be for the sole use of his creditors who are members of the exchange, we are of the opinion that such rules are contrary to the terms and purpose of the bankruptcy law, and void. If rules of that character should be sustained, it would be the forerunner of similar rules by other groups of business men, with the result that the constitutional purpose of the bankruptcy law, and its most exacting and embracing terms to fulfill this purpose, would be frustrated.

For the reasons here given, covering in part those given by the referee and the District Court, with which we are in accord, the decree appealed from is affirmed.