### E. B. WAPLES & CO. V. H. C. OVERAKER & CO.
#### No. 6439.

1. **Breach of Contract to Buy Wheat—Right of Seller.**—Waples & Co. agreed with Overaker & Co. to buy 3350 bushels of wheat on sample at 70 cents per bushel, freight to Sherman and 2½ cents per bushel added. The wheat (seven car loads) was sent to Sherman consigned to Waples & Co., who declined to receive it, alleging its inferiority to the sample. Overaker & Co. were notified of the refusal, and correspondence ensued and a refusal on part of Waples & Co. to receive it. They were then informed that the railway company was pressing for the cars in which the wheat remained, that they would be held responsible for the breach of contract, and that Overaker & Co. would be compelled to sell the wheat then or reship it if Waples & Co. did not receive it. Overaker & Co. then made efforts to sell in Sherman and at other markets in Texas. Failing to sell, they shipped the wheat to New Orleans, a good market, and there sold it. They sued Waples & Co. for damages and recovered judgment for $1457.89. *Held:*

1. There may have been such constructive delivery and existence of such other facts as would have vested title to the wheat in Waples & Co., but under the facts they can not claim that such an absolute delivery had been made as would defeat the lien of Overaker & Co. for the purchase money.

2. As the wheat stood in the cars, Waples & Co. refusing to receive and pay for it it was the right of Overaker & Co. to hold it until its price was paid. They might have recovered the difference between the contract price and the market price at time and place of delivery; or they might have held the property for Waples & Co. and at their

risk, and have recovered the purchase money, viz., the aggregate of freight and 72½ cents per bushel.·

3.   The right of the seller to resell in satisfaction of unpaid purchase money, if title but not possession has passed, seems to be well settled; and if there is a contract to sell and performance be tendered and refused the same rule applies.

4.   It is enough that the defaulting buyer has notice of the facts which give to the wronged seller the right to resell when these consist of the absolute refusal of the buyer to comply with the contract of sale.

5.   It is the duty of the seller in such case to exercise good faith and to realize the best price he can on resale.

6.   If the purchasers refusing to accept desired to select a market they should have received the wheat and sent it to that market.

7.   The place of sale is not restricted to the place where by the contract the vendee was bound to receive the property; circumstances may justify shipping it to a distant market for resale.   See facts.

8.   Whether the market selected and mode of sale were fair are questions of fact.

2.   **Motion for New Trial—Diligence.**—Where the pleadings indicated an issue in the litigation a party is bound to prepare to meet such issue before trial; after losing he can not have a new trial for the purpose of producing witnesses which he did not attempt to procure from alleged want of knowledge that such testimony was needed.

APPEAL from Grayson.   Tried below before Hon. D. H. Scott.
The opinion states the case.

*Hare; Edmonson & Hare,* for appellants. — 1.   Where the seller elects to resell the goods which the buyer has refused to accept under contract, he must clearly establish notice of such election and intention to resell. It is wholly insufficient for him to prove that he has notified the purchaser that he would either resell or do something else.   Sedg. on Meas. of Dam., 6 ed., p. 337, note 2, and authorities cited; Newm. on Sales, secs. 391, 405, and authorities in note 8; Holland v. Rea, 48 Mich., 218; 2 Kent's Com., 677; Pollen v. Le Roy, 30 N. Y., 549; 2 Corbin's Benj. on Sales, 1013; Fancher v. Goodman, 29 Barb., 315.

2.   Notice of an intention to resell must not only be given to the purchaser who refuses to accept the goods under contract, but must be clear and explicit.

3.   When the appellants (defendants) refused to accept the wheat and the plaintiffs elected to resell they should have sold the wheat in Sherman, and if there was no market there for the wheat then it should have been shipped to the nearest market to Sherman.   They had the right to ship to a distant market only when there was no market in Sherman, and not by supposing that they could get a better price by shipping to a distant market.   Chapman v. Ingram, 30 Wis., 290.

4.   The court erred in its charge to the jury when informing them that a simple notice of intention to sell was all that was required of plaintiffs before shipping to a distant market; the law being that there can be no shipment to a distant market without a direct notice.   2 Schoul. on Pers. Prop., 547.

5.   The measure of damages was the difference in the contract price and the market price in Sherman.   Chapman v. Ingram, 30 Wis., 290; Weldon v. Meat Co., 65 Texas, 487; Duston v. McAndrew, 44 N. Y., 78; Sedg. on Dam., 282; Pollen v. Le Roy, 30 N. Y., 549.

*R. De Armond* and *C. N. Buckler*, for appellees.

STAYTON, CHIEF JUSTICE.—Appellants, who were millers, residing and doing business in the city of Sherman, made a contract with appellees under which the latter were to buy wheat at the market price in Collin County, where they lived.

This wheat they were to ship to appellants, who therefor were to pay the market price paid by appellees, freight from place of shipment to Sherman, and in addition to this 2½ cents per bushel for such wheat as might be thus bought and shipped to appellants during the season of 1884.

Seven car loads of wheat were thus bought by appellees early in July and shipped to appellants, who on the arrival of the wheat at Sherman refused to receive it, whereupon it was shipped by appellees to New Orleans and there sold, but at a loss, and this action was brought to recover damages for breach of the contract.

There is some conflict in the evidence, but the case made by appellees was in substance this: The contract was proved as stated; on July 9 appellees had bought under the contract and had loaded in seven cars 3350 bushels of wheat, when they received a telegram from appellants directing them not to ship any more wheat at that time.

On receipt of that telegram one of appellees, with samples of the wheat in the cars, went to Sherman and exhibited the samples to appellants, who then agreed to take the wheat at 70 cents per bushel, with freight and 2½ cents per bushel added; whereupon, on July 11, the wheat was sent to Sherman consigned to appellants, who refused to receive it, of which appellees were not informed until the 14th or 15th of that month, when they were notified by the railroad agent at Sherman that they had refused to receive the wheat, and that the railway company desired to use its cars, which were still standing on a side track with the wheat still in them. On receipt of this information one of appellees went to Sherman to induce appellants to receive the wheat, but they refused to do this, and gave their written rejection of the wheat, basing that on claim that the wheat was inferior to samples furnished, which, in view of the evidence, the charge of the court, and the verdict of the jury, must be considered to have been untrue.   Appellants were then informed that the railway company were pressing for the cars, that they would be held responsible for the breach of contract, and that appellees would be compelled to sell the wheat there or reship it if they did not receive it.

Appellees then tried to sell the wheat to other millers in Sherman, but were

unable there to find a market for it, whereupon they sought a market for the wheat, through telegrams, in Dallas, Houston, and Galveston, but were unable to find a market for the wheat in Texas, whereupon they were compelled to sack the wheat and ship it to New Orleans, where it was subsequently sold. It is further shown that New Orleans was considered the best market for Texas wheat, and that when appellants refused to receive the wheat at Sherman wheat had fallen in price and was selling at 65 cents per bushel.

One of appellees stated that he told one of appellants "that we could not sell the wheat in Sherman, and that the road had notified us that they wanted the cars, and that I would have to reship the wheat to some other point where I could find sale for it. He just remarked, 'that is your business, not mine,' and kept on walking away from me, and did not seem disposed to talk about the matter."

After this J. H. Hays was sent by appellees to Sherman to sell or reship the wheat still in the cars, and to sack it for shipment if this became necessary.

This witness made another effort to sell the wheat in Sherman, but failed, when he sacked it and shipped to New Orleans. While in Sherman he also had a conversation with one of appellants, which, so far as pertinent, he states as follows: "I went to the Eagle Mills, the one owned by defendants, and there found defendant Paul Waples and one or two others. I stated that I had been sent by plaintiffs to see about that rejected wheat, and inquired what they proposed to do about it. I told Paul Waples that my instructions from Overaker were to either sell the wheat or to reship it. I told him the railroad would not let us have the cars much longer, and that something had to be done. To this Waples made no satisfactory reply; simply said that he could do nothing. * * * I simply told him that I had been sent by plaintiffs to sell or reship the wheat." Witness then stated the efforts he made to sell at Sherman, and that failing in that the wheat was sacked and shipped to New Orleans.

After the conversation between Overaker and Paul Waples before referred to, the former wrote (on July 16) to appellants the following letter:

"Montcastle [his partner] refuses to do anything about the seven cars wheat, so leaves it all on me. Mr. Paul, treat me like a white man over this thing. The wheat is there, and God knows I am willing to do the clean thing. You recollect all the time what you told me about buying wheat for you. Now let me know what you will do for me about this. If the wheat was of my own to say about, I then could decide at once. Let me know.               Yours, etc.

               "H. C. OVERAKER."

The letter was not replied to, and was received by appellants before the conversation between them and Hays occurred.

It is not shown that there was any agreement to sell the wheat on credit,

and in the absence of this it must be presumed that it was to be paid for on delivery.

There may have been such constructive delivery and existence of such other facts as would have vested title to the wheat in appellants, but they can not claim, under the facts shown, that such an absolute delivery had been made as would defeat the lien of appellees for the purchase money.

The conduct of appellants forbids their claim that such a state of affairs existed.

They denied having any interest in the wheat or liability for its price, and refused to make their possession absolute.

Had they done the latter appellees would have been driven to an action to recover the agreed price.

As the wheat stood in the cars, appellants refusing to receive and pay for it, it was the right of appellees to hold it until its price was paid, as they might have done had the wheat not been shipped to Sherman.

Appellants having refused to receive and pay for the wheat, appellees might have retained it and have recovered the difference between the contract price and the market price at time and place of delivery, or they might have held the property for appellants, and at their risk, and have recovered the purchase money, which under the agreement would be the aggregate of freight paid and 72½ cents per bushel.

Appellees, however, were not bound to pursue either of these courses on the refusal of appellants to receive and pay for the wheat, for they had the right to resell and appropriate proceeds on the debt due them, and were not bound to run the risk of the insolvency of appellants, which they would do if they pursued either of the other courses suggested, nor were they bound to assume the risks resulting from fluctuation of markets or the perishable nature of the article.

The right of the seller to resell in satisfaction of unpaid purchase money, if title but not possession has passed, seems to be well settled, and if there is a contract to sell and performance be tendered by the seller the same rule applies.  Whitney v. Boardman, 118 Mass., 242; McLean v. Richardson, 127 Mass., 345; Lewis v. Greider, 51 N. Y., 231; Jackson v. Court, 5 Wend., 141; Smith v. Pettee, 70 N. Y., 13; Ullman v. Kent, 60 Ill., 271; Bagley v. Findlay, 82 Ill., 524; Pollen v. Le Roy, 30 N. Y., 549; Young v. Martins, 27 Md., 115; Gordon v. Norris, 49 N. H., 382; 2 Schoul. Per. Prop., 546, 549; Benj. on Sales, 746, 747.

It is not contended that the measure of damages fixed by the charge of the court was erroneous, but it is urged that the court erred in permitting the application of that measure to this case because "there was no evidence of a direct notice of an intention to ship to New Orleans having been given; and further erred in charging 'that a simple notice of intention to sell was all that was required of plaintiffs before shipping to a distant market;' and further erred in instructing the jury 'that

after simply giving notice to defendant of an intention to sell the wheat plaintiffs had the right to sell in a distant market if plaintiffs found themselves either unable to sell in Sherman or that they could get a better price by shipping to a distant market.'"

In reference to these matters the court instructed the jury as follows: "If, however, you find that the wheat was as good as the samples, and defendants refused to accept the same, then plaintiffs had the right, after giving notice to defendants, to sell the same for the best attainable market price, and if they were unable to sell in the market at the place of delivery, or could get a better price by shipping, they had a right to ship and sell at the best and most convenient market; hence, if you find that plaintiffs complied with their part of the contract and defendants did not comply with their part, and if plaintiffs gave defendants notice of their intention to sell the wheat, and plaintiffs afterwards did sell or cause the same to be sold within a reasonable time, and if it was necessary for them to transport the wheat to get a market for it, then and in that case you will find damages for plaintiffs," etc.

Another part of the charge made the right of plaintiffs to recover under the rules applicable to cases of resale to depend on notice to defendants of intent to resell.

The evidence bearing on the question of actual notice of intent to resell was somewhat conflicting, but ample to sustain the finding of the jury on that issue.

We are of opinion that there was no error in the charge of the court as to the notice of intent to resell of which appellants can properly complain; and that the charge was more favorable to them in this respect than it ought to have been under the uncontroverted facts of the case. That the wheat was tendered to appellants at the proper place of delivery is not controverted, nor is it denied that they absolutely refused to receive it. It was known that appellees were purchasers of wheat, and of the particular wheat, for sale at once and not to hold. The wheat was known to be in cars the railway company was demanding; and we are of opinion that knowledge of these and other like facts conveyed to appellants notice of the vital fact necessary for them to know to authorize appellees to sell same to other persons and to subject them to the liabilities resting on the buyer who refuses to comply with his contract in cases in which the seller resells. They had notice and knowledge of appellees' legal right to sell to some other person, resulting from their unqualified refusal to comply with the contract to receive and pay for the wheat when tendered at the proper place of delivery.

It is enough that the defaulting buyer has notice of the facts which give to the wronged seller the right to resell, when these consist of the absolute refusal of the buyer to comply with the contract of sale. Ull-

man v. Kent, 60 Ill., 273; Schoul. on Per. Prop., sec. 551; Saladin v. Mitchell, 45 Ill., 80.

After notice of the right thus arising, notice of an actual intent to sell could only operate in the way of a threat to induce compliance. If having once refused to comply with the contract there be *locus pœnitentiæ* for the buyer, he must avail himself of it without further notice or request from the seller.

There was nothing in the evidence from which it could have been understood that appellees intended to waive their right.

It is urged that appellees had no right to ship the wheat to New Orleans for sale and make the price at which it there sold the basis of the recovery; that it should have been sold in Sherman or in the nearest market.

It is the duty of the seller in such a case to exercise good faith and to realize the best price he can on resale; but if in the light of the facts before him, obtained in the exercise of due diligence, he pursues the course which prudence would dictate to a man of ordinary prudence, then the defaulting buyer ought not to be heard to say that the market in which the thing was sold was not in fact the most advantageous one.

If appellants desired to select the market they ought to have received the wheat and sent it to that market. There are cases which seem to hold that the seller has not the right to ship to a distant market for sale when the buyer refuses to receive the thing bought. Chapman v. Ingram, 30 Wis., 290; Ricking v. Tenbroeck, 63 Mo., 568.

If such a rule was recognized, in case property could not be sold at the place where the buyer ought to receive it, the right of the seller to resell would be practically taken away. The true rule we believe to be that asserted in Lewis v. Greider: "The place of sale is not necessarily restricted to the place where by the contract the vendee was bound to receive the property. The vendors having, as they should, the interest of both parties in view, had the undoubted right, as a means of guarding against loss, to procure an insurance upon it; and within the rule that would justify such reasonable outlay to save it from loss, they should be permitted to exercise a reasonable discretion as to the place of sale, and to exercise it within a reasonable time." Whether the market selected and manner of sale was fair were questions open to inquiry, but from the evidence introduced there is no reason to question either.

A motion for new trial was asked on the ground of newly discovered testimony, by which appellants proposed to show that a market might have been found for the wheat at Sherman and at other places in Texas at which it had been shown that appellees had tried without success to find a market; and as an excuse for not having the evidence on the trial it was claimed that the original petition did not negative these facts, and that the contents of amended petition, filed the day before the trial, which did, were unknown to them.

No sufficient reason is shown why appellants did not ascertain what the amended petition was; they had opportunity to read it, and must have heard it read at the opening of the trial, and did not then claim surprise.

If, however, they were shown to have been excusably ignorant of the averments of the amended petition, this would not benefit them, for the motion for new trial shows that the original petition contained such averments as would make such evidence as that claimed to be newly discovered not only proper but necessary on the trial.

Moreover the answer alleged "that such wheat was worth on the Sherman market at the time defendants refused it 80 cents per bushel, and plaintiffs by the use of reasonable diligence could have obtained that price for it, instead of sending it at such great expense to a distant market, where the price was less."

This answer shows that appellants were fully aware that they needed just such evidence as they claim to have discovered after trial to meet the case made by appellees' pleadings, and the motion for new trial fails to show that any effort was made to obtain it.

The court did not err in overruling the motion for new trial, and its judgment will be affirmed.

*Affirmed.*

Delivered April 15, 1890.