PLANTERS' OIL CO. et al. v. GRESHAM.
(No. 1295.)

(Court of Civil Appeals of Texas. Amarillo. Feb. 27, 1918. Rehearing Denied March 20, 1918.)

1. CORPORATIONS ☞378—JOINT LIABILITY—VALIDITY.

Two corporations separately organized were not in law identical because of the fact that they had a common president, or in certain transactions acted one for the other, since a custom, however acted upon or known to the corporations, could not make them identical, and corporations may not form a partnership unless permitted to do so by their charters.

2. CUSTOMS AND USAGES ☞17 — CONSTRUCTION OF CONTRACT.

Custom cannot be allowed to vary or contradict a plain or unambiguous contract either expressly or by implication, and incidents sought to be imported into a contract by custom must not be inconsistent with its express terms or any necessary implication therefrom.

3. CUSTOMS AND USAGES ☞17—ACTUAL DELIVERY—WASHING-OUT PROCESS.

Where a corporation bought cotton oil for actual delivery, and sold a like amount to another corporation, the first sale being subject to rules of an association which required actual delivery, and did not provide for a washing-out process by delivery to the ultimate purchaser instead of the first purchaser, the custom of washing out such sales could not be set up to vary the actual contract.

4. CONTRACTS ☞143—CONSTRUCTION.

The courts will enforce contracts and give relief for their breach according to the rules of law, and not by the custom of any association.

5. BANKRUPTCY ☞154—SUITS BY TRUSTEE—SET-OFF.

Where corporation bought cotton oil and sold like quantities to another corporation, the seller, having failed to deliver, could not, in an action for damages by the trustee in bankruptcy of the purchaser have a set-off by the washing-out process, on the theory that the oil was really to be delivered to the second purchaser, in view of Bankr. Act July 1, 1898, c. 541, § 68, 30 Stat. 565 (U. S. Comp. St. 1916, § 9652), as to set-off and counterclaim.

6. ELECTION OF REMEDIES ☞7(1) — WHAT CONSTITUTES.

Where corporation bought cotton oil subject to rules of an association which required notice of date when to ship to be given by the purchaser, and, on failure to deliver authorized the purchase through a broker of like quantities, and the trustee in bankruptcy of the purchaser authorized a broker to buy like quantities, but the broker failed to do so, the employment of the broker was not an election of remedies, but

the trustee could establish damages in spite thereof.

**7. SALES ☞152—CONSTRUCTION.**

Under contract for sale and purchase of cotton oil, giving the seller ten days before expiration to wire for shipping instructions, and requiring ten days' notice (Sundays and holidays not included) that he would buy through a broker, the parenthetical clause did not limit the ten-day clause, since it would make a November contract impossible of performance by the buyer, one Sunday and one holiday falling within the period when the seller could act, leaving but eight days for the buyer to act.

**8. CONTRACTS ☞147(2)—CONSTRUCTION.**

If a contract is susceptible of two constructions, one of which would render it illegal and the other legal, that construction which will conform it to the evident purpose of the parties must be adopted.

**9. SALES ☞418(2)—BREACH OF CONTRACT—MEASURE OF DAMAGES.**

Where a corporation contracted to buy oil, which the seller failed to deliver, the trustee in bankruptcy of the buyer having notified the seller that he would purchase oil on the market, could recover his actual damages based on the continued breach to the end of the time of performance, though he elected to declare the breach more than five days before expiration of the contract, which required the damages for breach to be ascertained on a basis of the market price within five days from such declaration.

**10. SALES ☞418(3)—BREACH OF CONTRACT—MEASURE OF DAMAGES.**

Compensation for breach of a contract to sell goods as a general rule is fixed at the difference between the contract price and the market value at the time and place of delivery.

**11. SALES ☞127 — BREACH OF CONTRACT — DECLARATION OF BREACH.**

Where defendant sold oil to a corporation for future delivery, and the trustee in bankruptcy of such corporation demanded, ten days before expiration of the contract, notice of shipping instructions, notifying the defendant that otherwise he would purchase on the market, such notice was not a declaration of breach, where he further allowed defendant until two days before expiration to deliver the oil through a broker.

**12. SALES ☞417 — BREACH OF CONTRACT — MEASURE OF DAMAGES—EVIDENCE.**

In action for damages by breach of contract to deliver cotton oil, evidence *held* to show that the price paid by the trustee in bankruptcy of the buyer for oil on the market was the market value.

**13. SALES ☞420 — BREACH OF CONTRACT — QUESTIONS FOR JURY.**

In action for damages for breach of contract to deliver oil, where the facts were undisputed, peremptory instruction was proper.

**14. BANKRUPTCY ☞280 — VOLUNTARY BANKRUPTCY—EFFECT UPON CONTRACTS.**

Since under section 70 of the Bankruptcy Act (U. S. Comp. St. 1916, § 9654) title and possession of contracts and rights thereunder vested in the receiver and trustee upon adjudication of bankruptcy, a trustee appointed for a buyer of oil could accept and enforce previous contracts cum onere, and the voluntary character of the bankruptcy was not an anticipatory breach by the buyer.

**15. BANKRUPTCY ☞280—VOLUNTARY BANKRUPTCY—EFFECT.**

One who agreed to deliver oil at a future date to a corporation, which later went into voluntary bankruptcy, could not defeat the trustee's action for damages for the breach on the theory that the trustee failed to elect within

a reasonable time whether to accept the contract, since, had he not so elected, the bankrupt itself could have enforced the contract.

**16. BANKRUPTCY ☞254—VOLUNTARY BANKRUPTCY—EFFECT.**

Where a corporation purchased oil for future delivery, and later went into voluntary bankruptcy, the mere fact that the trustee waited until he could ascertain whether there was a profit in the contract before accepting it would not be dilatory, since it was his duty to do so.

**17. BANKRUPTCY ☞280 — VOLUNTARY BANKRUPTCY—EFFECT.**

Although under Bankr. Act, § 63 (U. S. Comp. St. 1916, § 9647), voluntary bankruptcy is an anticipatory breach of a contract so far as concerns the establishment of a provable claim against the bankrupt, it is not such a breach as concerns the trustee's right to enforce the contract.

**18. SALES ☞418(14)—BREACH OF CONTRACT—MEASURE OF DAMAGES.**

Where corporation made contract to purchase oil for future delivery, and was later declared bankrupt, and the trustee, learning that the seller would not deliver, ordered a broker to purchase on the market, and when the broker ascertained the market price pretended to sell such oil to the broker for the bankrupt, so as to establish his damages, he was not entitled to the allowance of the broker's commission on the sale, since in fact there was not a sale.

**19. APPEAL AND ERROR ☞1052(5) — HARMLESS ERROR.**

If evidence received was inadmissible, the error, if any, became harmless, where the court took the case from the jury by instructing a verdict which would have been necessary regardless of whether such evidence was admitted.

Appeal from District Court, Grayson County; C. T. Freeman, Judge.

Suit by O. S. Gresham, trustee in bankruptcy of the Sherman Cotton Oil Provision Company, against the Planters' Oil Company and others, wherein the Magnolia Cotton Oil Company intervened. Judgment for plaintiff, and defendants appeal. Reformed and affirmed.

Fiset, McClendon & Shelley, of Austin, for appellants. Wood, Jones & Hassell, of Sherman, for appellee.

HUFF, C. J. The appellee accepts the statement of the case as made by appellants in their briefs, except to supplement the same by the statement that appellee in his petition not only alleged that there was a contract measure of damage, but also alleged the common-law measure of damage for the breach of the contract. The following statement so made by appellants we shall adopt, in connection with the above statement made by appellee:

"The appellee, O. S. Gresham (who will be referred to for convenience as trustee), in his capacity as trustee in bankruptcy of the Sherman Cotton Oil Provision Company (which will hereafter be referred to as the Sherman Company), a private corporation, which had been adjudged a bankrupt in the United States District Court for the Northern District of Texas, sitting at Sherman, brought this suit against the appellant Planters' Oil Company (which will hereafter be called the Planters' Company), in the district court, fifteenth judicial district, of

Grayson county, Tex., for alleged damages for breach of two certain contracts for the delivery of prime crude cotton seed oil. The trustee alleged the execution of two contracts, dated the 14th day of September, 1915, made through a broker, whereby under the first contract the Planters' Company sold and agreed to. deliver to the Sherman Company five tanks (160 barrels) of prime crude cotton seed oil, at 38 cents per gallon, f. o. b. Texas common points, subject to the rules of the Texas Cotton Seed Crushers' Association, for November shipment, 1915. The second contract was in all respects the same as the first, except that it provided for December, 1915, shipment. The trustee alleged that subsequent to the making of the contracts the Sherman Company had been adjudged a bankrupt, and the plaintiff was made trustee in bankruptcy; that the trustee had in all things complied with the rules and regulations of the Texas Cotton Seed Crushers' Association with regard to giving notice and matters of that sort; that the Planters' Company failed and refused to make the deliveries, and the trustee had, in compliance with the rules of said association, purchased other oil at an advance in price, and had been compelled to pay certain commissions and expenses. The amount sued for was the difference between the contract price and the price at which the trustee was alleged to have purchased the oil, plus interest, commissions, and expenses.

"The Planters' Company answered by general demurrer and general denial, and by special answer, setting up: (a) Waiver on the part of the receiver and trustee of the Sherman Company of any rights under the contracts by reason of failure on their part to elect within a reasonable time to affirm the same. (b) A denial of the right to recover commissions and expenses on the ground that no oil was actually bought by the trustee as alleged. (c) That the Magnolia Cotton Oil Company (which will hereafter be called the Magnolia Company) had purchased under two like contracts the same amount and character of oil for delivery in the same territory and during the same months at 37½ cents per gallon, said contracts being made subject to the rules of the Interstate Cotton Seed Crushers' Association, which were in all respects substantially the same as those of the Texas Association; that the Sherman Company, the Planters' Company, and the Magnolia Company were all members of both associations; that, under the customs existing among members of said associations and dealers in said product, generally throughout the state, the Magnolia Company and the Planters' Company had always been regarded and treated as one concern, having the same president and practically the same stockholders, and that, under said customs and usages, wherever purchases and sales had been made in such a way as not to require actual delivery of the product in order to carry out the terms of the contracts, no delivery was made, under a system of what was called 'washing out,' or 'matching out'; that these customs were a part of said contracts, and thereunder the right existed to offset the Magnolia purchase from the Sherman Company against the Sherman Company's purchase from the Planters' Company. The Planters' Company also asked leave to make the Magnolia Company a party defendant, and to have the said contracts offset one against the other. The Magnolia Company voluntarily appeared, asked leave to intervene as a party defendant, and adopted that portion of the Planters' Company's answer claiming said right of set-offs. The trustee excepted to that portion of the answer of the Planters' Company claiming the right of offset and praying to have the Magnolia Company impleaded, and objected to the Magnolia Company being allowed to make itself a party to the suit. The court granted leave to the Magnolia Company to file said answer and plea of intervention,

and it was thereupon agreed in open court by all the parties that the exceptions addressed to the answer of the Planters' Company, asserting the right of set-off and the right to have the Magnolia Company impleaded, should be also considered as addressed to the answer and plea of intervention of the Magnolia Company. Upon hearing said exceptions, the court sustained same, both as to said pleading of the Planters' Company and that of the Magnolia Company, and the Magnolia Company was thereupon dismissed out of the suit, having declined to amend. This action was excepted to by both the Planters' and Magnolia Companies.

"The cause thereupon proceeded to trial before a jury, and, after all the evidence was introduced, the court peremptorily instructed the jury to return a verdict in favor of the plaintiff for the amount of the difference between the contract price and the price for which the trustee had purchased other oil, with interest thereon, and for brokerage charges, and the jury under said instructions returned a verdict for $14,046.46. Judgment was accordingly entered by the court for the amount of said verdict, with interest thereon from the 31st day of January, 1917, at the rate of 6 per cent., and for all costs of suit. Both the Planters' and Magnolia Companies seasonably moved for a new trial, and, with leave of the court, filed an amended motion for new trial. This motion was overruled on the 26th day of March, 1917, to which action both the Planters' and Magnolia Companies excepted, and gave notice of appeal, and seasonably perfected said appeal."

Assignments from 1 to 11, inclusive, are based on the action of the court in sustaining exception C, presented by the appellee, to subdivision C, paragraph 3, of the Planters' Oil Company's answer, and in also sustaining exception D to paragraph 4, impleading the Magnolia Cotton Oil Company, and in rendering judgment sustaining the exception and striking out that portion of the Planters' answer, and dismissing the intervention of the Magnolia Cotton Oil Company.

By the fourth paragraph of the answer the defendant impleaded the Magnolia Company, and for cross-action against said company referred to subdivision C of paragraph 3 of the answer of appellant Planters' Company. It was agreed in the court below that the exception contained in the supplemental petition of the Sherman Company should be considered as addressed to the plea of intervention by the Magnolia Company. Exception C was to the effect that subdivision C in paragraph 3 of the answer constituted no defense to plaintiff's cause of action, in that the custom or agreement of "washing out" is not alleged to have been part of the contract or that the plaintiff had agreed to such method; that the Planters' and Magnolia Companies were alleged and shown to be separate corporations, and, under the statute governing bankruptcy, there could be no set-off made as a defense to the cause of action on account of indebtedness to the Magnolia Company; that such answer shows that they were not mutual debts and credits and not in the same right, and were forbidden by the law to be set off, one against the other; that defendant can urge no defense against the bankrupt estate by alleging that it is indebt-

ed, to another corporation. Exception D was urged against paragraph 4 of the answer, wherein it was sought to implead the Magnolia Company, for the reason that the allegations do not show that the Magnolia Company had any interest in the subject-matter of the suit, or that the defendant had any claim against the Magnolia Company by reason of the suit. The two contracts sued on are set out in the petition and are identical in form and terms except one is for delivery in November and the other for December, and are to the tenor and effect following:

"Houston, Texas, Sept. 14, 1915.

"Contract No. S–30–a.

"Planters' Oil Company, Hearne, Texas—Dear Sirs: Referring to telephone and wire messages exchanged to-day, we have sold for your account to Sherman Cotton Oil Provision Company, Sherman, Texas, five tanks (160 barrels) prime. crude cotton seed oil, at 38c per gallon, f. o. b. Texas common points.

"Loose in buyer's tanks (to be loaded to capacity) f. o. b. your station; seller guaranteeing weights and quality at destination.

"Terms: Demand draft on the buyer with bill of lading attached, full amount of invoice, seller paying commissions 10c per bbl. of 50 gallons.

"Subject to the rules of the Texas C. S. Crushers' Ass'n.

"Copy. Internal revenue stamp affixed on file in this office.

"Shipment: November, 1915.

"This memorandum of sale is made in triplicate, the original being duly stamped and sent to the seller, one copy sent to the buyer, and one copy retained in this office as record.

"Yours very truly, J. G. Leavell Co.,

"Per H. Leavell, as Broker Only."

The propositions under the assignments assert that the right of set-off existed under the customs alleged and the universal custom of treating the Planters' and Magnolia Companies as a single entity, which were known to the association of oil dealers, and particularly to the Sherman Company, in which it participated, and for that reason were parts of the contract; that the pleadings establish the right of set-off of said contracts under the bankruptcy law as well as under the general law.

[1] The allegations in the answer stricken out on exception show that the Magnolia Company and the Planters' Company were separate corporations. They each had their existence by virtue of the law authorizing their incorporation, and as such under the law were separate entities and liable alone for their separate contracts and acts. The fact that they had a common president, or in certain transactions acted one for the other, did not in law make them one and the same. We do not understand that corporations can, by agreement, custom, or otherwise, form a partnership, unless by some provision of their charter. To have formed such a partnership would have been illegal. They could only act as given power by their charter or the law authorizing their creation. There is no allegation of such charter powers or any lawful right alleged so to act. Southern, etc., Co. v. Mexia, etc., Co., 186 S. W. 446; Sabine

Tram Co. v. Bancroft, 16 Tex. Civ. App. 170, 40 S. W. 837; White v. Pecos Land & Water Co., 18 Tex. Civ. App. 634, 45 S. W. 207; Murray Ginning System Co. v. Exchange National Bank, 61 S. W. 508.

A custom, however, acted upon, or known as to these two corporations, could not make them one corporation when the law created them two, and as distinct and separate parties, with the right to contract, sue, and be sued by their respective names. It is fundamental that a custom cannot countervene a rule of law or a plain statute. It is plain, under the law, that a contract by the Planters' Company to deliver oil to the Sherman Company did not obligate the Magnolia Company; neither did the contract by the Sherman Company to deliver oil to the Magnolia Company inure to the benefit of the Planters' Company.

[2] The custom pleaded in this case was repugnant to the plain obligation of the two contracts alleged. Custom should not be allowed to vary or contradict a plain and unambiguous contract, either expressly or by implication. Incidents sought to be imported into a contract by custom must not be inconsistent with its express terms or any necessary implication from those terms.

[3] The contract, as set out in the petition, and practically admitted in the answer, stipulated for the specific delivery of oil in a given way and place. The sale was made through a broker, who notified the appellant that the contract was subject to the rules of the Texas Cotton Seed Crushers' Association, and an examination of those rules reveals the fact that the oil so purchased and sold was to be actually delivered. Both appellant and appellee allege that the sale was made subject to such rules, and nowhere in the contract or rules is it shown that the sale was subject to the custom of "washing out" or "matching out." The custom sought to be incorporated into the contract would make a different contract and one not requiring delivery. In other words, the custom would render the contract one in which delivery was not contemplated—a mere speculating arrangement between the members of the association and in effect a gambling contract. The custom alleged would further make members of the association parties to the contract, thereby contradicting the terms of its obligation, and requiring the court in its enforcement to resort to "washing out" or "matching out."

[4] The courts will enforce contracts and give relief for their breach according to the rules of law, and not by the custom of any association. R. R. Co. v. Fagan, 72 Tex. 127, 9 S. W. 749, 2 L. R. A. 75, 13 Am. St. Rep. 776; American Warehouse Co. v. Ray, 150 S. W. 763; Josey v. Beaumont Waterworks Co. 183 S. W. 26; Henry v. Green Insurance Co., 103 S. W. 836; Moore v. Kennedy, 81 Tex. 144, 16 S. W. 740; Barnard v. Kellogg,

10 Wall. 383, 19 L. Ed. 987; Grace v. American Insurance Co., 109 U. S. 278, 3 Sup. Ct. 207, 27 L. Ed. 932.

[5] It follows, therefore, that there were no such mutual debts or credits, or in the same right, shown by the answer which could be set off against the claim sued on by the trustee in bankruptcy, under section 68a and b of the Bankruptcy Act. In re Howe Mfg. Co. (D. C.) 193 Fed. 524; In re Lesher (D. C.) 176 Fed. 650; Sawyer v. Hoag, 17 Wall. 610, 21 L. Ed. 731; Cumberland Glass Mfg. Co. v. De Witt, 237 U. S. 447, 35 Sup. Ct. 636, 59 L. Ed. 1042. We therefore believe the trial court ruled correctly in sustaining the exceptions and in dismissing the Magnolia Company's plea of intervention.

The appellants present a number of assignments based on the action of the court in peremptorily instructing a verdict for the appellee, and in refusing to instruct a verdict for the Planters' Oil, and on certain exceptions filed to the charge of the court.

The Sherman Company contracted to purchase the oil alleged through a broker acting for the Planters' Company. The terms of the contracts are set out heretofore in our consideration of assignments 1 to 11, inclusive. The two contracts are dated September 14, 1915, and call for delivery, respectively, November and December following. After entering into the contracts, the Sherman Company was declared a bankrupt on the petition of certain creditors of the Sherman Company, filed November 19, 1915. On the same day the petitioning creditors in the bankruptcy court made an application for the appointment of a receiver of the estate of the bankrupt, wherein it was stated that the bankrupt had entered into a great number of contracts for the purchase and sale of crude and refined oil; that among the profitable contracts are several which call for delivery in November, 1915, and unless completed in November the estate of the bankrupt will lose the profits in same, and also contracts for future delivery upon which there might be losses to the estate, etc.; that to delay action upon those contracts which ought to be affirmed and those which ought to be abandoned by the estate until a trustee in bankruptcy is selected will lose the opportunity which the estate now has of completing the advantageous contracts, and of declaring abandonment of the disadvantageous contracts, in advance of further loss therein. The Sherman Company waived time, notice, and service of process, and entered its appearance, and made no objection to an adjudication in bankruptcy being made immediately, nor to the appointment of a receiver. The day previous to filing the petition and the entry of the orders, to wit, on November 18, 1915, the Sherman Company admitted, in an instrument duly executed, its inability to pay its debts and its willingness to be adjudged bankrupt. On the day of the filing of the petition for adjudication in bankruptcy, November 19, 1915, an order was entered adjudicating the company a bankrupt, and further ordering that its matters be referred to Hon. Charles Batsell, the referee of said court, and at the same time the court entered an order appointing O. S. Gresham receiver of the bankrupt estate, with power to take possession of the assets and property of the bankrupt, and was therein further directed and empowered immediately to examine into the purchase and sale contracts made by the bankrupt respecting deliveries of cotton oil, and report to the court such contracts as should be accepted and executed by him on behalf of the estate, and such of such reports as ought to be disaffirmed and abandoned by him in behalf of the estate, to the end that the court may make such orders in the premises as may seem to the best interest of the estate. On said 19th day of November, 1915, O. S. Gresham, as receiver, duly qualified as such, of the estate, giving the required bond, which was duly approved. On November 20, 1915, the receiver filed in court his report, stating that he had examined into purchase and sale contracts, and expressed the opinion that certain contracts named should be adopted and executed by him on behalf of the estate; and the contract with the Planters' Company, dated September 14, 1915, for November delivery, at 38 cents per gallon, one of the contracts sued on herein, was among the number. In connection with the above report on the contract mentioned and others, he stated that all matured in the month of November, and that it was essential that said contracts be taken actively in charge by the receiver, and that he be empowered to do those things necessary to carry the contracts into effect. He further represented that there were other executory contracts, but he had not had time or opportunity to complete his examination, and that he did not recommend said contracts to be adopted or rejected; that he would complete his investigation, and report further to the court. On November 20, 1915, the court entered in its order reciting that the preliminary report was heard, and he approved the recommendation of the receiver, and granted his prayer, and that the specifically enumerated contracts in the report should be adopted and taken over and completed for the benefit of the estate, and his power and authority theretofore granted should be enlarged and extended so that he was thereby authorized and directed to take all such steps as may be necessary and appropriate to carry said contracts into effect. On the same day, November 20th, the referee of the court entered upon said report an order with like terms as the one entered by the judge of said court, reciting, further, that such action was acquiesced in by the petitioning creditors. On November 22d the receiver reported, as to the contracts for De-

cember delivery that were for the purchase of oil by the bankrupt, that the value of said products depended on the market for the same for such month, and its value fluctuated from day to day, and depended largely upon the question of railroad traffic; that there was a great amount of detail work, and for that reason and that first stated he was unable at that time to intelligently recommend action on such contracts, and asked for additional time. On that day the referee approved such report and the recommendation and granted further time. The receiver also filed a like report for January, February, and March, 1916, contracts, which was substantially the same as for December contracts, and like action was had thereon. The bankrupt on November 30th, in compliance with the first order appointing a receiver, and adjudging the corporation a bankrupt, filed with the referee its schedules, setting forth a full list of all of its assets and liabilities, which also contained a full list of all November and December contracts, including the two set up in this suit. On the 9th day of December, Gresham, the appellee, was duly appointed trustee by the referee, and he duly qualified as such, executing his bond as required, which was approved on that day. On the 12th day of December, Gresham, as trustee, filed with the referee a report, which recited that in compliance with the direction of the court to select and to report to the court a list of contracts of the bankrupt, which in his judgment should be carried into execution and completed, that he found the contract sued on, which is for December delivery, as one which showed to be a substantial asset. The referee set down the report for hearing on December 17th, and on that day the trustee filed a supplemental report, recommending that the December contract sued on should be carried out and enforced, and also in the supplemental report recommended the rejection of certain other contracts; and on the 17th day of December the referee entered an order approving the report and the supplemental report, also approving the recommendation of the trustee as to the December contract herein sued on, together with others, and also the rejection of certain other contracts, including the Magnolia Company's contract. On August 21, 1916, the trustee, upon his application, was granted authority to file this suit, which order was granted before the filing of the suit. November 20, 1915, the trustee wired the Planters' Company, referring to contract of September 14, 1915, for five tanks of oil, November, asking for shipping instructions immediately for empty tanks. This wire was confirmed by letter of that date, stating also that he then awaited the company's reply designating shipping points for tank cars, in order that tanks may be forwarded in accordance with the contract. Also on that date the trustee wired the Planters' Company, referring to the above telegram, that he must have answer in his hand not later than 6 o'clock p. m. of that date or that he would buy oil for the Planters' Company account. Again, on November 23, 1915, he wired: "Unless forwarding instructions received for empty tanks today, will buy oil for your account. Answer." The Planters' Company did not answer any of these communications. With reference to the December delivery contract, appellee wired the Planters' Company, December 17, 1915:

"By order of the referee in bankruptcy, I am instructed to perform contract between you and bankrupt, whereby you sold bankrupt eight hundred barrels of crude oil for December shipment. Please wire immediately where you desire tanks forwarded to take delivery of this oil."

On December 18, 1915, appellee wrote confirming the telegram, and on December 22, 1915, the appellee wired the Planters' Company:

"Unless advised to-day that you will deliver oil on contract referred to in my wire of 17th instant, shall proceed to buy in for your account, holding you for all costs, expenses, and damages. This my official notice of my intent to so proceed."

On the same day this wire was confirmed by letter. The contract as made recited therein that it was made "subject to the rules of the Texas C. S. Ass'n." The briefs of the parties herein refer to section 9, rule 28, of the association, as relating to the stipulation in the contract. That rule reads:

"Sec. 9. In case of contracts for oil for specific shipments, it shall be the duty of the seller to notify buyer at least ten days previous to the expiration of the period in which tank cars might be forwarded in time to reach seller, in time to admit of shipment of the oil within contract period. In case seller does not give such instructions within the period specified, it shall be the duty of the buyer to ask by wire for such instructions, confirming by letter, and then, failing to receive them at least ten days before the last day of the contract time of shipment, may, upon wire notice, given 48 hours in advance (Sundays and legal holidays not included) through any recognized cotton seed products broker a member of this association in good standing, buy the oil contracted for, holding the seller for any loss and expense incurred in such repurchase, and accounting to him for any profits earned in it over the contract price."

P. G. Claiborne testified he was a broker, residing in Dallas, Texas, and engaged in that business in November and December, 1915, and was at that time and since a member of the Texas Cotton Seed Crushers' Association, and otherwise qualified himself as to experience and knowledge as to market prices; that the trustee herein instructed him on November 29, 1915, as broker, to buy, for the account of whom it may concern, five tank cars of prime crude cotton seed oil, the Planters' Oil Company of Texas as an interested party. In accordance with the rules of the association, he notified the Planters' Oil Company on that day that the trustee had so instructed him, and requested it to

submit its lowest offer by wire on the five tanks, as it was the interested party. On that day he bought in five tanks for account of whom it may concern, at 53½ cents per gallon. In making the purchase he made request from a number of mills and cotton oil dealers for the lowest offer of five tanks of oil, and when the lowest offer was submitted he placed that offer before the trustee, "and he sold me the oil for account of whom it may concern, at the price of 53⅓ cents per gallon, basis Texas common points." The broker wired the Planters' Company of the purchase on the afternoon of November 29, 1915, and the price paid for the oil. He received no reply from the Planters' Company to his several wires. He testified that he bought the oil on December 28, 1915, at the request, of the trustee, following the same method, giving the same notices, etc., as he did in the November transaction. He purchased the oil on that day for 55 cents per gallon. The same procedure was had with reference to the December oil as that of November. He also testified the above price was the lowest market price on that date, and that it was the market value of that class of oil on that date, basis Texas common points. It is apparently conceded by the parties hereto that the purchase above effected was by the trustee for the benefit of the estate. It was also admitted that there were no forwarding instructions given to the trustee by the Planters' Company upon his request. After the purchase for the respective months, November and December, the trustee made out an itemized statement of the amount due the estate, which in November was the difference between 38 cents, the contract price, and 53½ cents, the market price for that month, and for December the difference between 38 cents, the contract price, and 55 cents, the market price, together with costs of purchasing through the broker.

Assignments 12 to 31, inclusive, will be considered together, as they present or relate to the same questions from various angles. It will be impracticable to consider the various assignments and propositions thereunder seriatim. The contention is made by appellant that section 9, rule 28, gave an exclusive remedy; that the trustee elected to proceed under the rule, and all other remedies were excluded by such election; that the rule contemplated an actual purchase by the trustee, and that he merely pretended to make the purchase by purchasing from himself; that, if the trustee still retained the remedy of recovering the difference in the market value and the contract price, there was no basis in the testimony from which to estimate such damages, and he presents various other propositions corollary to the above. We shall consider the contract admitted and proved in connection with the rule relied upon. The contracts each stipulated the seller, the Planters' Company, agreed to sell and deliver five tanks of oil, at 38 cents per gallon, f. o. b. Texas common points, loose in buyer's tanks, f. o. b. Planters' station, "subject to the rules of the Texas C. S. Crushers' Association." It will be seen by the rule heretofore quoted that, in case of contracts of oil for specific shipment, that it stipulates "it shall be the duty" of the seller, at least 10 days before the period and time to admit of shipment within the contract period, to give notice for shipping instructions.

[6] This we regard was an absolute obligation on the seller. If he did not so notify within the period specified, "it shall be the duty" of the buyer to ask by wire for such instructions, and, failing to receive the same, he "may," "upon wire notice, given forty-eight hours in advance (Sundays and legal holidays not included)," through a broker, buy oil, holding the seller for any loss. We think it is evident, from the rule, the seller's duty under the contract was to notify or request shipping instructions. If he did not do so, it was the duty of the buyer to ask for them. If the seller did not give them he was in default, and the right was in the buyer to establish his damages. The rules gave him the privilege of fixing such by purchasing through a broker. He was not absolutely obligated to do so. This was not a dependent promise by the buyer to fix an obligation on the part of the seller to pay the loss for the breach. Buying through the broker was only permissive under the rule. The language of the rule is the seller must, either with or without a request, give shipping instructions for the tanks, and if he fail the buyer "may" purchase. It was optional with him whether he did so or not. The renunciation of the contract by the Planters' Company occurred when it failed to give the notice for shipping instructions. The fact that the trustee attempted, but failed, to comply with the rule with reference to purchasing through a broker, would not release the oil company from the damages occasioned by the breach, for the reason that the purchase of oil was not a condition necessary to fix the sellers' liability for the breach, and was not made so either by the contract or rule. We do not think an effort or attempt to purchase oil under the rule would be such an election as to defeat a recovery for damages under the rule for the measure of damages given by law. Brodkey v. Lesser, 157 S. W. 457; Stone v. Boone, 73 Tex. 548, 11 S. W. 544; Bull v. Bearden, 159 S. W. 1177. In fact, the remedies are not inconsistent; the law and the rule give practically the same measure to ascertain the loss occasioned by the breach. Sullivan v. Ramsey, 155 S. W. 580 (subs. 10 and 11). It is insisted by appellant that the trustee did not purchase the oil for the reason he was both seller and buyer, and in

this we are inclined to agree with appellant. He hence did not buy from some outside party, and the rule did not give him the right to buy from himself, but, as we think, required an actual purchase. We hold that he did not waive his right to recover his damages upon the breach of the contract by giving notice to appellant, and employing a broker to purchase who in fact did not. Sullivan v. Ramsey, supra.

[7] A proposition is presented to the effect that in wiring for instructions for shipment after the seller had failed, under the rule the buyer must do so at least 10 days before the last day of the contract time, legal holidays and Sundays not included; and, as Sunday and Thanksgiving fell within the 10 days for the November contract, that the wire on the 20th day of November by the trustee was too late. We do not think the parenthetical clause, including Sundays and legal holidays, limited the 10-day clause. If so, it would make the contract impossible of enforcement by the broker. The seller had until 10 days before the expiration of the contract time to wire for shipping instructions, and until he failed the buyer was not authorized to call for instructions. This would render the contracts for delivery during the month nonenforceable.

[8] If a contract is suspectible of two constructions, one of which would render it illegal and the other legal, that construction which will conform it to the evident purpose of the parties must be adopted. As an illustration, in this case the seller had not wired for instructions on the 20th. On that day the buyer, the trustee in this case, wired for instructions. Excluding the day upon which the wire was sent, there were only 10 days left in November. It is our construction of the rule that the first clause, down to the period, referred to the duty of the seller as to the 10 days' notice before the expiration of the contract period, which it will be observed does not refer to legal holidays, etc. The next clause refers to the duty of the buyer, and if his wire is not answered he "may, upon wire notice, given forty-eight hours in advance (Sundays and legal holidays not included)," purchase the oil through a broker. Sundays and legal holidays are not to be included in the 48 hours for notice that he would purchase through a broker. The construction contended for by appellant would render the contract impossible of performance if the seller so willed it. If the appellee, under his pleadings for damages, stated to be the difference between the contract price and the market value, has shown by evidence such damage, he is entitled to recover.

[9] It is asserted by various propositions that the measure of damages was the market price the day the trustee elected to consider the contract breached, and that there is no evidence of such value on that date; that the market price should not extend beyond the five-day period provided for by the rules prior to the expiration of the last day for shipment. Without setting out the rules with reference to what was meant by "immediate," "at once," etc., with reference to shipments, we simply hold that they will not apply in this case in our judgment. In this case there was an anticipatory breach of the contract by the seller. It is now established, we think, that the buyer was entitled to compensation, based as far as possible on the ascertainment of what he would have suffered by the continued breach to the time of performance under the contract.

[10] Compensation, as a general rule, is fixed at the difference between the contract price and the market value at the time and place of delivery. Greenwall v. Markowitz, 97 Tex. 479, 79 S. W. 1069, 65 L. R. A. 302; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; San Angelo Cotton Oil Co. v. Houston, etc., 185 S. W. 887; Bost v. McCrea, 172 S. W. 561. In this case the deliveries were to be made in November and December. The market was established within the contract time for delivery. If there was any other market value or reason for not allowing evidence or recovery on the market on the 29th and 28th of the respective months, it seems to us the appellant ought to have shown that fact.

[11] However, we do not believe the wires of the trustee to the Planters' Company, November 23d and December 22d, an acceptance of the breach. The notice was shipping instructions must be had that day, or he would buy oil for the company's account through a broker. On the 29th of November and December 28th the broker was instructed to so purchase the oil, and appellant Planters' Company was duly notified thereof and of the purchase made and the price paid. The appellant was given until the dates above mentioned to deliver the oil. It could have sold to the broker that amount of oil at the contract price and discharged its obligation. The market price was fixed on those days, and we believe should control. The buyer had the right to treat the contract as in full force, and have his damages determined with reference to the conditions at the time fixed in the contract. It appears to us this is what the trustee did in this case. He fixed the damages within the contract period on a specified day, after due notice and warning of the seller. Mechem on Sales, vol. 2, §§ 1750, 1707, 1088, 1089; Waples et al. v. Overaker, 77 Tex. 7, 13 S. W. 527, 19 Am. St. Rep. 727; Palestine Ice, etc., v. Walter Connally Co., 148 S. W. 1109; Texas Seed Co. v. Chicago, etc., 187 S. W. 747, 752. It is suggested in the brief of appellants, we think, that under the contract the trustee should have gone on the market and have actually purchased the quantity and quality

of oil named in the contract. It would not have been to the advantage of the seller if he had done so, for, if he had bought at the market value, the result to the seller would have been the same as if the buyer simply proved the market value. Saxe v. Penokee Lumber Co., 159 N. Y. 371, 54 N. E. 14. If we are correct in holding the rule with reference to purchase through a broker requires an actual purchase, and that the purchase made by the trustee did not comply therewith, we yet believe the trustee was not precluded from recovering his damages for breach of the contract given and the rules of law. We believe also that the trustee, the purchaser through the broker, in all particulars substantially complied with the rule with reference to notice, etc., and, if the purchase as made had been an actual purchase, he should recover the difference between the contract price and the price paid by the broker, together with the costs of making it.

[12] A proposition is also presented to the effect that there was no evidence that 53½ cents per gallon and 55 cents per gallon was the market value on November 29th and December 28th, respectively. As to December 28th, it was shown beyond cavil that 55 cents was the market value by the broker, who was shown to have known the market value on that day; as to November 29th, 53½ cents was the best for which oil could be purchased from dealers on that day on the market. This was shown by the broker who the evidence establishes knew the market at that time, and we think tested it thoroughly in order to buy as cheaply as he could. We believe this was sufficient evidence of its market value. San Angelo Cotton Oil Co. v. Houston, etc., 185 S. W. 887.

[13] It is also urged by various propositions that the above various issues raised issues of fact which should have been submitted to a jury for their findings. We think the facts were undisputed on the various points, and the court properly instructed peremptorily as to them.

[14] A proposition is also presented to the effect that the bankrupt proceedings in this case, being in effect voluntary, amounted to an anticipatory breach of the contract by the bankrupt, and the trustee, without the consent of the Planters' Company, could not enforce the contracts. Under section 70 of the Bankrupt Act, title and possession of the contracts and the rights thereunder vested in the receiver and trustee upon the adjudication of bankruptcy. If the trustee accepted the contracts, he took them cum onere, but could enforce the bankrupt's right thereunder. We do not understand from the act that the obligee was thereby released until he assented to be bound to the estate. The discretion was not with the Planters' Company, but with the trustee. The trustee, having accepted these claims under the order of the court, could enforce them. We think this is recognized by the Supreme Court in the case of Central Trust Co. v. Chicago, etc., 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; citing therein Sparhawks v. Yerkes, 142 U. S. 1, 12 Sup. Ct. 104, 35 L. Ed. 915; Sunflower Oil Co. v. Wilson, 142 U. S. 313, 12 Sup. Ct. 235, 35 L. Ed. 1025. See, also, In re Gay (D. C.) 182 Fed. 260; Moline Plow Co. v. Blackburn, 74 Neb. 246, 104 N. W. 178; Hansen, etc., v. Wyman, etc., 105 Minn. 491, 117 N. W. 926, 21 L. R. A. (N. S.) 727; Burton v. Lockert, 9 Ark. 411.

[15] Under assignments 32 to 37, inclusive, the appellants present the proposition in various forms that it was the duty of the receiver and trustee to use all diligence to determine whether or not it was to the advantage of the estate to accept the contract for December delivery, and within a reasonable time to elect whether he would adopt same as an asset of the estate; that, under the facts and circumstances of the case. it affirmatively appears the trustee failed within a reasonable time to make such election, and he therefore waived and forfeited the claim; that at least it was a question of fact for the jury.

As we understand the bankrupt act, interpreted in the light of the decisions, if the trustee had found the contract a burden to the estate, he could have refused to take title to or possession of it. If he had done so, this would not have left the contract without an owner or one in whom there was no title or right. The title and right of possession would have remained in the bankrupt, and it could have enforced the rights under the contract in precisely the same way as before bankruptcy. In re Frazin, 183 Fed. 28, 105 C. C. A. 320, 33 L. R. A. (N. S.) 745; Dushane v. Beall, 161 U. S. 513, 16 Sup. Ct. 637, 40 L. Ed. 791; Briggs v. Avary, 47 Tex. Civ. App. 488, 106 S. W. 904. Usually the question of the reasonableness of an election arises between the trustee and bankrupt or some one claiming an intervening right. We cannot conceive very well how one obligated on a contract can assert that he is not liable for a breach, either to the trustee or the bankrupt, or some one holding in privity or through an intervening right, simply because the trustee has not elected within a reasonable time to accept it. This question, and the manner in which it may arise, is illustrated in Sparhawks v. Yerkes, 142 U. S. 1, 12 Sup. Ct. 104, 35 L. Ed. 915; Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609. The question, as shown by the record, could only be material as between the bankrupt and the trustee, and as between them the action of the court on the report and request made by the trustee concludes the matter. It is therefore not a question in which

the Planters' Company has any interest. It is not contended that there was any intervening right, nor is there any pretense that the trustee surrendered the contract to the seller in settlement of a claim against the bankrupt.

[16] We thought it to be unnecessary to set out the evidence on the question of the reasonableness of the time in which the election was made, but, if that question was necessary to decide, we would hold that the election was made in a reasonable time. It was made before the time to give the necessary notices and while the obligation of appellant was still in force. The appellant was within that time officially notified of such election and approval by the court. The mere fact, if it was a fact, that the trustee waited until he could ascertain whether there was a profit in the contract to the estate, would not be dilatory, but it was his duty to so ascertain before he accepted the claim. In re Zehner (D. C.) 193 Fed. 787; Collier on Bankruptcy (9th Ed.) 1027 (2).

[17] It is asserted by appellant that bankruptcy constitutes an anticipatory breach of executory contracts held by the bankrupt at the time of bankruptcy. This, as we understand, is true, and is announced by the courts in considering section 63 of the act with reference to establishing provable claims against the estate on executory contracts, the performance of which is in the future and after an adjudication in bankruptcy. The courts, as we understand, treat the adjudication as an anticipatory breach, giving to the claimant an immediate action against the estate on the contract under the rule established by the Supreme Court in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, In re Stern, 116 Fed. 604, 54 C. C. A. 60, and many other cases. We do not understand because, for the purposes of showing a provable claim, that bankruptcy is regarded as an anticipatory breach, that all claims accepted by the trustee are so breached in the sense that the trustee or bankrupt may not enforce an executory contract, on the ground that they have themselves breached the contract and that such anticipatory breach defeats their right. It is usually said the bankrupt is disabled from performing the future acts which he has obligated himself to perform, and the party injured thereby has the right to prove his claim for damages, established as of the date of the bankruptcy. But as we conceive it, if the trustee accepts a claim he asserts he can carry out his part of the contract and reap the benefit of the profits for the estate, and hence no breach follows. It occurs to us that because the courts treat certain claims against the estate on such contracts as being breached upon bankruptcy for the purpose of proving them up ought in no way to affect the liability of the obligatee on his liability to the estate for damages upon his breach of the covenants. The above assignments will be overruled.

[18] Assignments 38 to 41, inclusive, object to the court's charge in directing the jury to find $80 on each contract as costs or commission paid to the broker in making sales November 29 and December 28, 1915, with interest. Under the conclusion reached by us, there was no such sale as contemplated by the rule of the association, and for that reason the court was in error and should not have so instructed. To that extent the judgment should be reformed, giving it credit for $80, with interest thereon at the rate of 6 per cent. per annum from December 17, 1915, and $80, with interest thereon at the rate of 6 per cent. per annum from January 10, 1916, to the date of the rendition of the judgment in the trial court. We think no error, or such an error as should reverse the case, is shown by assignment 42.

[19] The forty-third, forty-fourth, and forty-fifth assignments are overruled for the same reason. If any of the evidence was inadmissible, and if the bill of exception was sufficient, the error, if any, became harmless, as the court took the case from the jury by instructing a verdict; and as we conceive the case, with or without the evidence objected to, there could have been no other judgment except as above pointed out. We therefore will not take further space to discuss these assignments.

The judgment of the trial court will be reformed, and as reformed affirmed, the costs of the appeal taxed against the appellee.