In re PHILADELPHIA CONSISTORY SUBLIME PRINCES ROYAL SECRET 32 DEGREE ANCIENT, ACCEPTED SCOTTISH RITE.

No. 21745.

District Court, E. D. Pennsylvania.

Oct. 5, 1942.

Thomas P. Mikell, of Saul, Ewing, Remick & Harrison, of Philadelphia, Pa., for Trustee in Bankruptcy.

Percival H. Granger, of Philadelphia, Pa., for petitioner.

John M. Hill, of Philadelphia, Pa., Referee in Bankruptcy.

Albert T. Hanby, of Philadelphia, Pa., for Harris and others.

KIRKPATRICK, District Judge.

The bankrupt, which will be referred to as the Consistory, is an unincorporated association. Membership in it was attained by becoming successively a member of each of three subordinate bodies, which may be referred to (in ascending order) as the Lodge, the Council, and the Chapter, each successive elevation being upon petition and conditioned on payment of an additional membership fee. Thus, each member of the Consistory is also a member of all three subordinate bodies, and it happens that most, though not quite all, the members of all the three subordinate bodies are members of the Consistory.

None of the subordinate bodies owns any property or assets of any kind, and none of them have ever carried a bank account. The title to the property owned by the Consistory is vested in three trustees. The Consistory also has a treasurer, the same person being also treasurer of the three subordinate bodies. Initiation fees and dues were customarily paid by members of the subordinate bodies to this person, and by him turned over to the trustees. The relation of the Consistory to the subordinate bodies is described in the by-laws of the three organizations as that of their "fiscal agent." Some of the confusion existing in the minds of the claimants has evidently arisen from the use of this term. The Referee has found that, to whatever extent the Consistory may have been an agent in the technical sense, it took the funds turned over to it as owner, unimpressed by the obligations which would normally arise on a principal-agent relationship. This is an important point, and I specifically affirm the finding.

The Consistory and the three subordinate bodies all exist subject to and, among themselves, are bound by the by-laws and regulations ("Articles") of a fifth body—the Supreme Council. Among these governing provisions is one which provides that the Supreme Council may revoke the charter of any subordinate body and that, upon such revocation, all the property of such subordinate. body shall become the property of the Supreme Council. At some date subsequent to the Consistory's insolvency the Supreme Council revoked its charter, and it has ceased to exist as a unit in the Masonic hierarchy.

The trustees in bankruptcy of the Consistory have in their possession three sepa-

100

rate funds, one of which was turned over to them by the trustees of the Consistory under decree of this court and another by the Land Title Bank and Trust Company. These four certificates for review are all taken to orders of the Referee denying applications of various claimants to the funds for turn-over orders. The result of the Referee's orders is that all three funds will be distributed among the general creditors of the Consistory.

## 1. The General Fund

This fund is a bank account of $7,528.80, being the balance of the general checking account of the trustees of the Consistory. It is claimed by the three subordinate bodies each of which claims 18/84 by virtue of a provision of the articles of the Supreme Council, which provide that, "Should no plan for the allocation of any assets (in the hands of the Consistory) have been adopted and approved, such allocation shall be based upon the ratio of the minimum fees established by Art. 307." This ratio is the basis for the fraction (18/84) claimed by each body. The fund came from dues and initiation fees, plus income from the operation of the Temple owned by the Consistory. There have been withdrawals from time to time for expenses of operation and other purposes, and it is conceded that there is no possibility of any of the subordinate bodies tracing the payments of its particular members.

 There is no question that the article of the Supreme Council quoted above is binding as between the four bodies involved and that, if rights of creditors had not intervened, it would have given the fund to the three subordinate bodies in the proportion claimed. However, this provision cannot affect rights of creditors asserted by trustee in bankruptcy, nor, as a matter of fact, does it appear that such was its purpose. Although, as I have found, no trust relationship arose as to it or any other fund in the hands of the Consistory, that circumstance is not the only one which would eliminate these claimants. Concededly the fund consists of more than merely dues and fees of members. It might not be necessary for each particular subordinate body to trace the payments by its members as distinguished from those of the others, but it is necessary that the whole fund claimed be identifiable. I rule that the claimants, the subordinate bodies, have failed to establish any right to this fund.

## 2. Life Membership Fund.

This fund was held by the trustees of the Consistory, separate from its general funds, and came into existence by virtue of provisions of an article of the Supreme Council which provided that life membership in a subordinate body might be granted upon payment of a sum of fifteen times the amount of the annual dues, and that the "amounts realized from issuance of such life memberships shall constitute a permanent fund, which shall be maintained as such, and the income only from which shall be available for such purposes as the body may designate." It consists of cash, securities, mortgages, and real estate, and amounts to something less than $75,000. The by-laws of the Consistory required the trustees to invest the moneys applicable to this fund and accumulate the income from it until the total amounted to $75,000. Thereafter the income was to be paid over by the Consistory's trustees to its treasurer to be used for the current general purposes "of the Consistorial bodies." The fund never quite reached $75,000, and the annual income was paid over by the trustees to the treasurer who thereupon repaid it to the trustees for further investment. Another by-law provided that the trustees should have no power to alter, change or dispose of any investment of the fund without the sanction of the Consistory. This fund is claimed (a) by the Supreme Council and (b) by Harris et al, individual members of the subordinate bodies. There are, therefore, two certificates for review relating to this fund.

 (a) Claim of the Supreme Council. This is based upon the article which was quoted above in connection with the general fund. This article applies only to "the property of said body." Hence the Supreme Council is not even a party in interest if the fund was not owned by the Consistory but was merely held by it in trust for the individual life members of the various subordinate bodies. If it is the property of the Consistory, then the article under which the Supreme Council claims it, while no doubt binding between it and the Consistory, is plainly in contravention of the provisions of the Bankruptcy Law. See In re McCown, D.C., 31 F.2d 334, affirmed, Middleton v. Fidelity-Philadelphia Trust Company, 3 Cir., 35 F.2d 851. In the case cited, a rule of the Philadelphia Stock Exchange which provided for distribution of the equity of an insolvent member in se-

curities pledged by him with another member, to other members of the Exchange ahead of the insolvent's general creditors, was held ineffective under the Bankruptcy Law. In the present case the article did not expressly provide that the rights of the Supreme Council should become vested in the event of insolvency, but if the Supreme Council revoked the charter of a subordinate body after the latter's insolvency the effect would be precisely the same as though the article had so provided. The claim of the Supreme Council in its own right, therefore, cannot be sustained.

■ (b) Claim of Harris, et al. Here the proposition is that the life membership fund was taken by the Consistory in trust for such members as chose to adopt this method of paying their dues in full, that it never was the property of the Consistory and that the article of the Supreme Council in question merely had the effect of constituting the Supreme Council the nominee of the life members, authorized by them to take the fund away from the Consistory and turn it over to a new trustee under some arrangement by which, if and when a new Masonic body to which they were eligible should be organized, they would obtain the benefits and privileges of membership in it, free for life of dues and assessments.

The entire argument is based on the fact that the life membership fees were kept in a separate fund, and, other than this, there is no evidence of any kind that a trust was intended. This certainly is not enough to raise a trust. The maintenance of the separate fund was obviously merely a sound method of making the life membership fees accomplish their purpose. Their payment relieved the payers from further payments of dues, and, by the same token, reduced the Consistory's expectancy of regular future income in the form of dues from these members. Unless they were somehow recognized as capital and segregated from the income arising from ordinary dues the Consistory's bookkeeping would be on an incorrect basis. The life members had no right to prevent amendments to the articles of the Supreme Council or the by-laws of the Consistory which would permit the fund to be applied to some other purpose, any more than life members of any club can control what is done with their fees after they become the property of the club. There being no trust, the claim of the

members to the life membership fund was properly denied by the Referee.

### 3. The Insurance Fund.

■ This is a fund of $7,593.81 held by Land Title Bank and Trust Company as trustee, and is claimed by Hanby, et al., members of the four organizations who were subscribers to it. The fund began to be accumulated in 1931, as part of a scheme to raise $800,000 to pay off a mortgage in that amount upon the Temple. The plan was to obtain at least 3,200 of the members of the Consistory each of whom would subscribe $250, either in lump sum payments or in installments, and would also take a thirty-year endowment life insurance policy in the amount of $375 as security for the payment of the balance of his subscription, after which it would inure to the benefit of himself or his family. The Consistory was to pay all premiums on the policies. If the plan had worked, the mortgage would have been paid off, and the Consistory instead of having to pay $48,000 a year interest and having to finance the principal at the due date of the mortgage would have had to pay only the premiums on the endowment policies until their maturities. The instruments, by which the plan was put into effect and the rights of the parties to it defined, were a deed of trust executed by the Land Title Company and the trustees of the Consistory, and the individual subscription agreements.

The campaign to raise money was a failure and was abandoned after less than 100 subscribers had been obtained. Of these, only 60 have paid their subscriptions in full, and they are the claimants. Nothing was ever paid from the fund upon the principal of the mortgage. The Consistory, which had agreed to pay the premiums to the Land Title Company, never paid anything on this obligation. The Land Title Company from time to time took from the fund in its hands sufficient money to pay premiums upon the outstanding policies of nondefaulting subscribers. These payments reduced the total fund from its maximum of $23,191.72 to its present amount. It is composed of subscriptions of both defaulting and nondefaulting subscribers, cash surrender value of policies of defaulting subscribers, and certain miscellaneous items all connected with the insurance scheme.

The only thing that affords any basis for the claim of the subscribers is the fact

that the Land Title Company was brought into the plan in a capacity which the parties described as that of trustee. As a matter of fact, if the "Deed of Trust" be carefully analyzed it will appear that there was really no trust or trusteeship here at all. The Land Title Company was never anything more than a mere custodian of money which belonged to the Consistory and which had been turned over to it with the intention that it should be used to pay off its mortgage but with no obligation whatever to apply it to any other specific use, for the benefit of any one other than itself, should that purpose fail. The trust agreement, binding upon the subscribers by the terms of their subscription agreements, provided, "the equitable and legal title to all funds derived from the sale of such subscription agreements * * * shall vest in the Association, and * * * the subscriber shall have no right, title or interest in and to said funds, except as set forth herewith. * * * All funds in the hands of the Trustee at the termination hereof shall be paid to the Association (the Consistory)."

Recognizing that this provision stands squarely in the way of their contention that, upon failure of the purpose of the trust, a resulting trust arose in favor of the subscribers to apply the remnant of the fund to paying their premiums (a contention which could have been made just as well had there been no Land Title Company, "trustee", in the picture and were the money in the hands of the Consistory), the petitioners point to the clause "except as set forth herewith," and attempt to associate it with certain parts of the recitals and with the statement of the purpose of the trust contained in its first paragraph. The recital is that "it is the desire of the said Association (Consistory) to provide funds for the satisfaction of said mortgage, the cost of the money raising campaign, the premiums on the insurance issued in connection with the plan, and other indebtedness of the Association." There is no suggestion that these declared purposes must be carried out in the order in which they are mentioned or that they would be violated if, while the fund was accumulating, some of the money was used to pay the general indebtedness of the Consistory. The first paragraph of the deed of trust is even broader. Its language is "and for such other general purposes as may be needed by said Association." A resulting trust can not possibly

arise where the trust document expressly provides that those who seek to have it declared shall have no interest or title, legal or equitable, in the fund. So far from qualifying the provision of the thirteenth paragraph, which declares this, the recitals and declaration of purpose confirm and amplify it.

The Consistory, not the Land Title Company, was the body whose promise to pay the premiums formed part of the consideration for the subscriptions. The Land Title Company was not bound to pay any premium unless it first got the money for it from the Consistory. The sixteenth paragraph of the deed of trust provided that the trustee assumed no personal responsibility for the payment of premiums "except out of funds received by said Trustee and on hand under and in accordance with this Trust Agreement." As security for the performance of the Consistory's obligation in respect of the payment of premiums, the subscribers had the elaborate provisions of the eleventh paragraph of the trust agreement by which the Consistory pledged its assets with the trustee and agreed that, in case it should default upon its obligation to pay the premiums to the trustee, the trustee could move in and assume complete management and control of all its buildings and property and apply the income to the payment of premiums. This step was never taken, the Land Title Company electing to short-cut the whole thing by taking the property of the Consistory already in its hands (the fund) and using it to pay premiums rather than undertaking to oust the Consistory from its other property and collect the premiums from that. Whether the Land Title Company correctly interpreted its rights and duties in this respect is not before this court, but it may be pointed out that, so far as the subscribers are concerned, the result of either course would be exactly the same. The insurance fund in the hands of the Land Title Company was the property of the Consistory and it could make little difference to the subscribers whether the Consistory's obligation to pay premiums was enforced by taking this part of the Consistory's property or some other part.

The point that the parties by their conduct have put a construction on the agreement which bears out the theory of a resulting trust in favor of the subscribers is without merit. Interpretation by parties' conduct has no place where the instrument

to be construed is plain, unambiguous, and admits of no doubt. Nor could the course of dealing pursued after the scheme had failed amount to a complete abrogation of the whole trust arrangement and the substitution of a new one without some evidence of an intention to that effect, and there is none.

The conclusion is that the subscribers to this fund are not entitled to prove except as general creditors.

Orders are entered herewith affirming the orders of the Referee upon each of the four certificates for review.